No. 91-406

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

THE STATE OF MONTANA,

Plaintiff and Respondent,

v.

BRETT DONALD BYERS,

Defendant and Appellant.



FILED

OCT 06 1993

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Frank M. Davis, and The Honorable
Thomas Olson, Judges presiding.

COUNSEL OF RECORD:

For Appellant:

Alexander "Zander" Blewett (argued),
Hoyt & Blewett, Great Falls, Montana;
Wendy Holton, Helena, Montana

For Respondent:

Hon. Marc Racicot, Attorney General, Barbara
Harris, Assistant Attorney General (argued),
Helena, Montana; Mike Salvagni, Gallatin
County Attorney, Bozeman, Montana

Submitted:    February 11, 1993

Decided:    October 6, 1993

Filed:

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal from the final judgment of the District Court of the Eighteenth Judicial District, Gallatin County, entered May 1991. Brett Byers was tried and convicted by a Butte-Silver Bow jury of two counts of deliberate homicide. We affirm the District Court on all issues.

We consider the following issues on appeal:

1. Does Montana's mental disease or defect statute unconstitutionally shift the burden of proof on the issue of mental state from the prosecution to the defense?

2. Does Title 46, Chapter 14 of the MCA violate the Fifth and Fourteenth Amendment right to due process of law and the Sixth Amendment right to a trial by jury?

3. Did the District Court err when it allowed the State's psychiatrist, William Stratford, to testify in spite of the fact that the State violated the discovery statutes and the trial judge's omnibus order, when it failed to disclose Dr. Stratford's diagnosis to the defense until he was in the midst of his testimony?

4. Did the District Court abuse its discretion in refusing to grant a mistrial when the State's psychologist, John Van Hassel, testified, in response to questioning by the County Attorney, to statements made during the course of his examination of Brett Byers?

5. Did the District Court abuse its discretion when it allowed the State to present evidence that the length of the shotgun possessed by Brett Byers was in violation of federal regulations?

6. Did the District Court err when it denied Brett Byers' motion to dismiss the charges of deliberate homicide in favor of those of mitigated deliberate homicide?

7. Did the District Court err by instructing the jury that it could convict Brett Byers if it merely found that Byers was aware of his conduct or if he had the conscious object to engage in conduct of a particular nature?

8. Did the District Court err by instructing the jury that voluntary intoxication is not a defense to criminal activity?

9. Did the District Court err by refusing to include voluntariness in instructions 17 and 18?

10. Did the District Court make an improper comment

2

on the evidence when it instructed the jury that consiousness of guilt could be inferred from flight?

11. Did the District Court err when it imposed a separate, consecutive sentence for weapon use even though the offense of weapon use was not charged?

12. Did the District Court err when it imposed a fifteen year sentence for weapon use when the statute provides for a maximum sentence of ten years?

13. Should Byers' conviction be reversed?

In the early morning of May 15, 1990, two Montana State University students, Brian Boeder and James Clevenger, were shot in a dormitory room on campus. Each student was shot twice and died before 4 a.m. that morning. Brett Byers, another Montana State University student, was subsequently arrested and charged with two counts of deliberate homicide for their deaths.

At arraignment, Byers gave notice he would introduce evidence of mental disease or defect at trial. The County Attorney requested Byers be sent to Warm Springs State Hospital for a psychiatric evaluation, which was done. Subsequently, Byers was also evaluated for the State by Dr. William Stratford, a psychiatrist. Byers himself obtained a lengthy evaluation by Dr. D. J. Plazak, a forensic psychiatrist.

The jury trial was moved from Gallatin County to Butte-Silver Bow and began January 2, 1991. The trial lasted nine days. At trial, Byers introduced evidence that he suffered from Borderline Personality Disorder and was in a derealized state at the time of the homicides and, therefore, could not have acted knowingly, purposely or voluntarily. Byers also presented evidence that he was under extreme emotional and mental stress at the time of the shootings. The State presented evidence that Byers acted knowingly

3

and purposely when he shot Boeder and Clevenger.

After receiving instructions, the jury found Byers guilty of both counts of deliberate homicide. A sentencing hearing was held and on May 17, 1991, Byers was sentenced to two seventy-five year terms of incarceration for deliberate homicide and fifteen years for the use of a weapon--all terms to run consecutively. Byers was designated a dangerous offender. This appeal followed and oral argument was granted.

I.

Does Montana's mental disease or defect statute unconstitutionally shift the burden of proof on the issue of mental state from the prosecution to the defense?

The statute at issue provides:

Evidence that the defendant suffered from a mental disease or defect is admissible to prove that the defendant did or did not have a state of mind that is an element of the offense.

Section 46-14-102, MCA.

Byers contends that his defense of mental disease or defect is inextricably intertwined with proof of "knowingly" or "purposely" which are elements of the crime. Byers contends that when such a defense negates an element of a crime, it becomes necessary for the prosecution to disprove the defendant's contentions with regards to that defense. According to Byers, it is unconstitutional to require a defendant to prove that he did not have the requisite mental state because of his mental disease or defect. Such a requirement, argues Byers, shifts the burden of proof from the State to the defendant.

The State argues that the burden of proof is not shifted to

4

the defense. The State contends that the Montana statute provides specifically that evidence relevant to the issue of mental disease or defect is admissible. The State argues that it must still prove the elements of the crimes beyond a reasonable doubt. Further, the State argues that Montana's statute does not provide an affirmative defense of mental disease or defect as Byers contends.

Byers' assumption that this statute shifts the burden to him to disprove an element of the crime is not correct. The statute enables a defendant to present evidence concerning his claim of mental disease or defect. It does not require the defendant to prove beyond a reasonable doubt that his disease absolutely negates the required state of mind.

To require such proof would be to determine that the presentation of evidence permitted to defendant by § 46-14-102, MCA, rises to the level of an affirmative defense. Evidence of mental disease or defect is not an affirmative defense. It is evidence of a condition that could have prevented the defendant from having the requisite state of mind. Whether defendant actually has a mental disease or defect and if so, whether that disease precludes the required mental state are questions of fact for the jury. We stated in State v. Watson (1984), 211 Mont. 401, 686 P.2d 879:

> Read together, the jury instructions properly informed the jury on the law of mental disease or defect and the burden on the part of the State to establish the necessary criminal intent beyond a reasonable doubt. Whether his mental disease affected the defendant's ability to act with purpose and knowledge was a question of fact for the jury. The jury answered that question by returning guilty verdicts on each count.

5

<u>Watson</u>, 211 Mont. at 415, 687 P.2d at 886.

It is unconstitutional for the State to be relieved of the burden of proof of an element of a criminal offense. In re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. The jury was properly instructed that the State had the burden to prove that Byers acted knowingly and purposely beyond a reasonable doubt.

Byers relies on Walker v. Endell (9th Cir. 1987), 850 F.2d 470, for his argument that if a defense negates an element of the crime, rather than mitigates culpability once guilt is proven, it is unconstitutional to put the burden of proof on the defendant. While that is true, <u>Walker</u> distinguishes defenses which necessarily negate an element of the crime and those that can, but do not necessarily do so. <u>Walker</u>, 850 F.2d at 472, 473.

In <u>Walker</u>, one of three co-defendants in a double homicide claimed that once their original burglary plan had gone awry, he was afraid of his comrades because of their violent propensities. He argued that he was under duress to go along with the murders for fear that the other two would shoot him. According to Walker he could not have had the requisite intent to commit the murders because of this duress.

On appeal, the court upheld Walker's 89 year conviction for kidnapping, robbery, burglary, and theft, committed attendant to the homicides. The appeals court stated that duress did not negate intent. <u>Walker</u>, 850 F.2d at 473. Duress and intent are not mutually exclusive terms. Similarly, the existence of a mental disease or defect in a person does not necessarily preclude such a

6

person from acting knowingly or purposely. State v. Korell (1984), 213 Mont. 316, 690 P.2d 992. It is up to the jury to determine the interaction of any mental disease or defect Byers may have and the required states of mind to commit the act in question.

Byers' reasoning is also faulty in his argument that the burden "shifts" to him by permitting him to introduce evidence that he did not act knowingly or purposely. When a burden "shifts" it goes from one party to another, from prosecution to defendant. But the prosecution here was not relieved of its burden. The jury was not instructed that Byers had any kind of burden at all. Byers chose to introduce evidence that he had a mental disease or defect and such condition prevented him from acting knowingly or purposely. By making this choice, Byers submitted testimony by a leading forensic psychiatrist that the homicides could not have been deliberate. But the trier of fact must weigh the witnesses' testimony knowing that the State must establish the necessary mental state beyond a reasonable doubt.

We conclude that the Montana statute is constitutional because the State is not relieved of its burden to prove all elements of the crime. We, therefore, hold that Montana's mental disease and defect statute does not unconstitutionally shift the burden of proof on the issue of mental state from the prosecution to the defense.

## II.

Does Title 46, Chapter 14 of the MCA violate the Fifth and Fourteenth Amendment right to due process of law and the Sixth Amendment right to a trial by jury?

7

## A. Due Process under the Fifth and Fourteenth Amendments

Byers argues that the question of whether he has a mental disease or defect impacts more than the issue of whether he had the requisite mental state. According to Byers, the question is also whether he had the moral culpability for the particular offense. Byers argues that because the court refused to instruct the jury on the traditional insanity defense, his Fifth and Fourteenth Amendment rights to due process were violated. Byers' contention is that failure to so instruct contravenes a fundamental legal principle that criminal sanctions will only be imposed on persons who act with wrongful intent in the commission of an offense.

The State argues that the current statutory scheme does not divest Byers of his right to due process under constitutional law. According to the State, this Court has already addressed the constitutional arguments put forth by Byers and determined that the current law is constitutional.

Montana requires the State to prove beyond a reasonable doubt that the defendant had the requisite state of mind. However, prior to the 1979 changes to the Criminal Code of this State, insanity was treated as an affirmative defense that the defendant had to establish by a preponderance of the evidence. State v. Korell (1984), 213 Mont. 316, 690 P.2d 992. In contrast, today a defendant may submit evidence of mental disease or defect without a requirement that he establish the same by any particular evidentiary standard.

As described in Korell, the defendant's alleged mental disease

8

or defect is now evaluated at three different stages of the legal proceedings. Before trial, the defendant's state of mind is considered by analyzing whether he is able to understand the proceedings and to assist counsel in his own defense. Section 46-14-103, MCA. During trial, the defendant may present evidence that he suffers from a mental disease or defect and did not have the requisite mental state. Section 46-14-102, MCA. During sentencing, the sentencing judge may consider whether at the time of the commission of the offense the defendant was suffering from a mental disease or defect that rendered him unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of the law. Section 46-14-311, MCA. The sentencing judge must then determine whether the mental disease or defect is such that defendant should be confined to a specialized institution. This third consideration is progressive in that it not only provides a defendant with a third consideration of his condition, but does so in a way that both he and the public are protected.

The due process clause of the Fourteenth Amendment was intended in part to protect certain fundamental rights long recognized under the common law. Korell, 213 Mont. at 327, 690 P.2d at 998. Byers argues that the insanity defense is firmly rooted in the common law and pleading the defense is a fundamental right protected under our national constitution. We have carefully considered this argument before and have stated that no constitutional right to plead insanity exists in the law. Korell,

9

213 Mont. at 334, 690 P.2d at 1002. We also note that the United States Supreme Court has determined that the Due Process Clause does not require the use of any particular insanity test. Leland v. Oregon (1952), 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302.

While the Montana statutory scheme eliminates insanity as an affirmative defense, it provides a criminal defendant the opportunity to present evidence that he has a mental disease or defect and places no particular burden on defendant in presenting his evidence. Because it is up to the jury to consider and weigh the evidence presented to it, the defendant need only cast a reasonable doubt in the minds of the jurors that he had the requisite mental state. Korell, 213 Mont. at 331, 690 P.2d 1000. The creation of such a doubt is far different than having to shoulder the burden of proof. Under the Montana scheme, the burden of proof never leaves the State.

In accordance with our holding in Korell, we conclude the statutory scheme involving evidence of mental disease or defect is constitutional. We hold that Title 46, Chapter 14 of the MCA, does not violate the Fifth and Fourteenth Amendment rights of the defendant.

B. **The Sixth Amendment Right to Trial by Jury.**

Byers argues that under the present statutory scheme, when a defendant enters a plea of not guilty by reason of insanity, he is deprived of his right to a trial by a jury. Byers argues that the present state of the law allows the mental disease or defect issue to be decided solely by the court. In making this argument, Byers

10

refers to the third step in the statutory procedure which directs the court to consider the mental disease or defect issue in the rendering of judgment. While the judge does consider mental disease or defect in sentencing, the State argues that Montana law further permits the defendant to provide evidence of mental disease or defect to the jury. As previously referred to, <u>Korell</u> discusses the three step approach to the presentation of evidence of mental disease or defect under the Montana statutes.

Byers' argument that the third step of the presentation of evidence pursuant to § 46-14-312, MCA, concerning mental disease or defect does away with his right to jury trial is clearly incorrect where he has already received such a trial. The effect of consideration of mental disease or defect by the judge under the statute does not nullify the jury verdict. That third step is a further precaution for the protection of both criminal defendants and society. This allows the court to consider defendant's mental disease or defect as it relates to appropriate institutionalization.

We hold that § 46-14-312, MCA, does not violate Byers' Sixth Amendment right to a jury trial.

### III.

Did the District Court abuse its discretion by allowing Dr. Stratford to testify after it was established that the State had failed to disclose his diagnosis pretrial?

Under § 46-14-205, MCA, the District Court ordered Dr. Stratford to conduct an examination of Byers to determine whether he had, at the time the offenses were committed, a particular state

11

of mind which is an essential element of the offense of deliberate homicide. Dr. Stratford complied with this order and the State presented his reports to Byers and to the court. The reports stated that Dr. Stratford determined that Byers did not have a mental disease or defect and had acted knowingly and purposely during the commission of the offenses.

Byers contends that Dr. Stratford's report as furnished to him did not contain any diagnosis. Byers next contends that the State violated discovery because it did not provide him with his diagnosis before trial but tried to introduce it for the first time at the time of trial. The court did permit Dr. Stratford to testify but did not allow him to testify as to his diagnosis. Byers contends he was effectively prevented from cross examining Dr. Stratford for fear of inadvertently bringing up the diagnosis, and also because cross examination prohibited his right to address the discovery violation.

The State argues that Dr. Stratford was asked to determine whether Byers had the requisite mental state of knowingly or purposely at the time the offenses were committed. The State further points out that it provided Byers with all Dr. Stratford's physical examinations, scientific tests, experiments or comparisons, including all written reports or statements made by Dr. Stratford in the evaluation. This included Dr. Stratford's notes from his interview with Byers. The State argues that Byers could have contacted Dr. Stratford directly at any time regarding his diagnosis.

12

The State admitted that Dr. Stratford had not furnished a diagnosis of Byers until several days before trial and the State did not at that time provide Byers a copy of the diagnosis. The court ruled that the State had violated discovery with regard to the diagnosis, and that the State could not question Dr. Stratford as to the diagnosis. The court did warn Byers that if cross examination opened up the diagnosis issue, then that would be Byers' problem. The District Court was correct in concluding the State breached its duty to disclose Dr. Stratford's diagnosis as required under § 46-15-327, MCA:

> **Continuing duty to disclose.** If at any time after a disclosure has been made any party discovers additional information or material that would be subject to disclosure had it been known at the time of disclosure, the party shall promptly notify all other parties of the existence of the additional information or material and make an appropriate disclosure.

As a result of the information furnished, Byers knew that Dr. Stratford would testify that Byers did not have a mental disease or defect and had acted knowingly and purposely during the offenses. Prior to Dr. Stratford's main portion of testimony at trial, Byers also knew that Dr. Stratford had concluded that Byers did not suffer from Borderline Personality Disorder.

Despite his foreknowledge of such testimony by Dr. Stratford, Byers contends he was unable to adequately cross examine Dr. Stratford because he had not known anything about Dr. Stratford's diagnosis and had no time to question his own expert on the technicality of the diagnosis so that a cross examination of Dr. Stratford would be meaningful. However, the record demonstrates

13

that the court offered Byers' counsel a continuance to question its own expert, Dr. Plazak, about Dr. Stratford's diagnosis. The court told defense counsel to inform it at the end of Dr. Stratford's direct examination if he wished this continuance. The record does not show any request by Byers for such continuance.

Defense counsel claims that any questioning of Dr. Stratford would have prevented Byers from alleging a discovery violation. In answer to this contention, we note that Byers did not need to allege a discovery violation. The court determined that one had occurred. Second, there is no reason why defense counsel could not have continued with his planned cross examination. Byers knew that Dr. Stratford would testify to his evaluation that Byers did not suffer a mental disease or defect and that he had acted knowingly, purposely and voluntarily when he committed the offenses. Counsel for Byers has failed to demonstrate any reason that the absence of the specific Stratford diagnosis prevented an adequate cross examination. While we do approve the District Court's limitation on the State's testimony because of the failure to disclose the Stratford diagnosis, we are unable to conclude that there was any adverse effect upon Byers.

The court prohibited Dr. Stratford from testifying about a specific diagnosis and allowed Dr. Stratford to testify to that information already in defense counsel's hands. The court properly prohibited a witness from testifying to something that was not disclosed. Section 46-15-329, MCA. Such prohibition was a sanction against the State. The District Court has the discretion

14

to levy sanctions it deems most appropriate for discovery violations. State v. Van Voast (1991), 247 Mont. 194, 805 P.2d 1380. Because the actual testimony was no different than what was contemplated and because Byers can point to no damage caused by Dr. Stratford's testimony, we conclude that the District Court's sanction was appropriate. Therefore, we hold that the District Court did not abuse its discretion by allowing Dr. Stratford to testify after it was established that the State had failed to disclose his diagnosis before trial.

IV.

Did the District Court err in refusing to grant a mistrial when the State's psychologist, John Van Hassel, testified, in response to questioning by the County Attorney, to statements made during the course of his examination of Brett Byers?

Byers contends that the only issue to be resolved by the jury is his state of mind. Byers further argues that the State was permitted to introduce evidence of that state of mind through testimony of its expert witness reciting comments made by Byers during an interview. It is Byers' contention that this testimony was an intrusion into his right of refusal to testify against himself pursuant to Article II, Section 25, 1972 Montana Constitution.

The State argues that Byers' own expert testified to Byers' thoughts before and after the shootings notwithstanding the court's directives. As a result of the testimony by Byers' expert, the State argues that its own testimony was admissible.

The court, after reviewing applicable statutes and case law, concluded:

15

THE COURT: This is regarding Section 46-14-401, which deals with the admissibility of statements made during a psychiatric examination under the Montana Criminal Code. Let the record show that I have reviewed the statute and I have paid particular attention to the case of State v. Statczar, 44 State Reporter 1668, issued by the Montana Supreme Court in October of 1987. And the holding is that statements made by a defendant for purposes of the psychiatric examination are not admissible in evidence against a defendant in any criminal proceeding on any issue other than that of his mental condition. And the Supreme Court cautions trial courts to refrain from admitting evidence of the defendant's mental condition which implies or constitutes an admission of guilt of the crime charged. So, I guess we are under that rule. <u>So, therefore, the State's psychiatric witnesses will not be able to comment on any statements made by the defendant which imply or constitute an admission of the guilt of the crime charged, but may only go into his mental condition.</u> [Emphasis added.]

The court denied the motion for mistrial on the basis that the State's expert engaged in proper rebuttal of the defense's expert witness and because any inappropriate testimony was inadvertent.

A trial court has the discretion to grant a mistrial. State v. Graves (1990), 241 Mont. 533, 788 P.2d 311. Where there has been no abuse of discretion, this Court must not disturb the district court's decision. <u>Graves</u>, 241 Mont. at 538, 788 P.2d at 314.

The Montana statute pertinent to this issue is:

**Admissibility of statements made during examination or treatment.** A statement made for the purposes of psychiatric examination or treatment provided for in this chapter by a person subjected to such examination or treatment is not admissible in evidence against him in any criminal proceeding, except a sentencing hearing conducted under § 46-14-311, <u>on any issue other than that of his mental condition.</u> It is admissible on the issue of his mental condition, whether or not it would otherwise be considered a privileged communication, unless it constitutes an admission of guilt of the crime charged. [Emphasis added.]

16

Section 46-14-401, MCA (1989) (now, 46-14-217, MCA). In order to determine whether testimony admitted at trial was in violation of the above statute and, therefore, prevented Byers a fair trial we consider the alleged offending testimony.

Byers contends that the offensive question and answer by the State was not inadvertent because the State specifically asked Dr. Van Hassel about Byers' statements:

Q.    What did he tell you about that?

A.    I don't recall his exact statements without referring to my notes. But he did indicate to us that he was aware that police cars were following him, and that he did speed up when they turned on their lights, and that when he arrived at East Helena and found the road blocked off, that he knew he couldn't get away, and that he knew he was in a lot of trouble and he did (sic) want to face it, and, consequently, he crashed his truck.

. . . . . . . . . . .

A.    I guess, you know, I could continue beyond that in the sense of, seemingly he was aware of what was happening at the time that he was arrested. He appears to have behaved in an expected fashion in the sense that he was aware that he was being arrested. I don't know how far beyond the time of the shootings you want to go, but I think there's substantial evidence that up to a very short time before those shootings and a very short time afterwards, he was fully aware of his behavior and fully capable of making conscious choices.

Byers contends that these statements imply an admission of guilt. The State argues that the above testimony was in rebuttal to Dr. Plazak's (Byers' expert) testimony earlier concerning Byers' post-shooting admonition to the Dormitory Resident Advisor to call the police. Dr. Plazak stated:

A.    [I]t would be very easy to interpret this as meaning that he knew that, at that point, something had happened which would require the presence of the police. Actually, my feeling

17

> after examining him and evaluating and talking to him about the incident, which incidently is very fuzzy in his mind anyway, although he's not amnesic or any of that, he was asking for help.

Dr. Plazak was permitted to testify that Byers had indicated to him that his recollection of the shootings was hazy. This testimony indicates Byers' mental state. Dr. Van Hassel was permitted to testify that up until a short time before and a short time after, Byers was capable of making conscious choices. We conclude that under the statute and the judge's orders, the testimony of both experts was appropriate as admissible statements regarding Byers' mental condition. We further conclude that Byers opened the door to this testimony by his initial examination of his own witness, Dr. Plazak, and therefore cannot object to the responsive interrogation by the State. We conclude that Byers was not denied a fair trial because of the above mentioned testimony.

We hold the District Court did not abuse its discretion in failing to grant a mistrial with regard to the testimony of State's psychologist, Dr. John Van Hassel. —

V.

Did the District Court abuse its discretion when it allowed the State to present evidence that the length of the shotgun possessed by Brett Byers was in violation of federal regulations?

Byers argues that the court erroneously allowed the State to present evidence that the shotgun used in the shootings had been altered to an illegal length and had a pistol grip. Byers' contention is that the State should have provided a _Just_ notice if it intended to offer evidence concerning an illegal weapon. See

18

State v. Matt (1990), 245 Mont. 208, 799 P.2d 1085. Byers contends that in the absence of a _Just_ notice, the court abused its discretion in allowing the State to present this evidence.

The State argues that the information concerning the illegal length of the shotgun is not a matter which required a _Just_ notice. According to the State, the weapon was part of the corpus delicti of the crime and was relevant to the case. The State contends that the uniqueness of the gun is a factor in identifying Byers as the alleged killer.

The District Court allowed the evidence of the illegal length of the gun, stating:

> The basis for my ruling is that there has been testimony that this weapon did once have a thirty inch barrel. That when it was given to the defendant it was in proper condition. And it was used in the crime, and I think the jury's entitled to know what the status of that weapon is and it may -- as it may be relevant in this case.

Byers argues that the testimony concerning the length of the gun was irrelevant because it had been altered to its present unique state several years before the shootings, not in anticipation of the shootings.

The barrel of the shotgun, which was found at the scene of the shootings, was 14 and 9/16" long and had a pistol grip. The minimum legal length is 18". The gun was subsequently identified as the murder weapon used to kill Boeder and Clevenger. Thus, any information that showed the identity of the perpetrator would be relevant because it linked the defendant with the scene of the crime and the victims. See State v. Pease (1986), 222 Mont. 455, 724 P.2d 153. This link was established by the unique character of

19

the gun. Part of that unique character was the fact that it had a short barrel.

We have stated that the State is entitled to present evidence of other crimes when these matters are inextricably or inseparably related to the crime. State v. Wolfe (1991), 250 Mont. 400, 821 P.2d 339. Here the State was permitted to introduce evidence of the act of owning an illegal length shotgun because it was inextricably related to the crime. The crime was conclusively proven to have been caused by the sawed-off shotgun left at the scene.

Byers' argument that no Just notice was given before the State entered the evidence of the illegal act is not correct. As this Court stated in State v. Gillham (1983), 206 Mont. 169, 179, 670 P.2d 544, 550:

> Likewise, evidence that Gillham told others of his plan to kill Nordahl, that he visited the Nordahl home, and that he followed Nordahl's vehicle intending to harm Nordahl is admissible under Riley as part of the corpus delicti of the crime charged. All of this evidence provides an explanatory context in which the jury was entitled to view the actions of Gillham. The State was entitled to present at trial the entire corpus delicti of the crime charged, including this evidence of acts closely related and explanatory of the crime charged. The District Court did not admit evidence in violation of the Just procedural requirements.

We conclude that evidence with regard to the shotgun is part of the corpus delicti of the crime and does not require the giving of a Just or Modified Just notice. We hold the District Court did not abuse its discretion in allowing evidence that the length of the shotgun possessed by the defendant was in violation of federal regulations.

20

Did the District Court err when it denied Brett Byers' motion to dismiss the charges of deliberate homicide in favor of those of mitigated deliberate homicide?

Byers claims that he asserted the affirmative defense of extreme mental or emotional stress for which there is reasonable explanation or excuse, and that such defense reduces deliberate homicide to mitigated deliberate homicide. Byers contends that the fact that he was under extreme emotional distress was undisputed at trial and the court should find as a matter of law that the jury could only consider mitigated deliberate homicide.

The State argues that the court correctly declined to direct a verdict. The State contends that a directed verdict may only be granted when no evidence exists to support a guilty verdict and such is not the case here. Further, according to the State the jury was given both the deliberate and mitigated deliberate homicide instructions. The State points out the jury was not convinced by Byers' argument because it did not find that defendant was under extreme mental or emotional distress for which there is a reasonable explanation or excuse as described in the instructions. Section 45-5-103, MCA.

First, we note that Byers did not ask for a directed verdict. He asked the judge to determine as a matter of law that the jury could only consider mitigated deliberate homicide and not deliberate homicide. Byers relies on three Montana cases for this argument concerning his motion: State v. Kamrud (1980), 188 Mont. 100, 611 P.2d 188; State v. Grenfell (1977), 172 Mont. 345, 564

21

P.2d 171; and State v. Frates (1972), 160 Mont. 431, 503 P.2d 47. In all three cases the issue involved was entrapment by police. In Grenfell we established that entrapment could be established as a matter of law. These three cases are not applicable to charges of deliberate or mitigated deliberate homicide.

In order for the charge of deliberate homicide to be reduced to mitigated deliberate homicide, the jury must be convinced by a preponderance of the evidence that such reduction is warranted, in accordance with § 45-5-103, MCA:

> **Mitigated deliberate homicide.** (1) A person commits the offense of mitigated deliberate homicide when he purposely or knowingly causes the death of another human being but does so under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse. The reasonableness of such explanation or excuse shall be determined from the viewpoint of a reasonable person in the actor's situation.
>
> (2) It is an affirmative defense that the defendant acted under the influence of extreme mental or emotional stress for which there was reasonable explanation or excuse, the reasonableness of which shall be determined from the viewpoint of a reasonable person in the actor's situation. This defense constitutes a mitigating circumstance reducing deliberate homicide to mitigated deliberate homicide and must be proved by the defendant by a preponderance of the evidence. [Emphasis added.]

The record demonstrates that the testimony of the defendant's experts and the State's experts were in various aspects contradictory and inconsistent. As an example, Byers' expert, Dr. Plazak, testified that Byers was under extreme stress during the shooting episodes. State's witness, Dr. Van Hassel, testified that Byers reported to him he felt extreme stress following an accident with his truck directly before the shootings. Dr. Van Hassel

22

testified that he believed that Byers' perception of his own state of mind was that he was under extreme stress. Dr. Stratford, the second State expert witness, did not specifically conclude that Byers was under stress. He did mention a series of things over which Byers was experiencing "problems." It was up to the jury to determine the weight to be attached to the testimony of the various witnesses. State v. Bower (1992), 254 Mont. 1, 833 P.2d 1106. We conclude the determination of the weight to be given to this testimony was within the exclusive province of the jury as trier of fact.

We hold that the District Court did not err in denying Byers' motion to dismiss the charge of deliberate homicide in favor of mitigated deliberate homicide.

VII

Did the District Court err by instructing the jury that it could convict Byers if it merely found that Brett Byers was aware of his conduct or if he had the conscious object to engage in conduct of a particular nature?

Byers argues that the jury was instructed improperly as to the meanings of "purposely" or "knowingly" with the result that the State's burden on the mental element of the offense was reduced. This, according to Byers, warrants a reversal of the jury verdict. Byers' contention is that "purposely" can be meant as 1) purpose to engage in conduct, or 2) purpose to cause a result. "Knowingly" is defined likewise as relating to either conduct or result--depending on the definition of the crime involved, asserts Byers. According to Byers, the crime of deliberate homicide is defined by a result-- the death of a human being. However, Byers contends that the jury

23

was erroneously given a composite of the two alterative meanings of these two states of mind so that it could convict Byers if it found that he possessed the requisite mental state only as to his conduct, not as to the result.

The State argues that the jury was clearly instructed as to the legal meanings of "knowingly" and "purposely." Byers' argument, according to the State, is that Byers can be convicted with the instructions given if he did not have the requisite intent. However, the State contends that specific intent is no longer required unless the statute defining the offense requires it as an element. According to the State, this Court has already considered Byers' argument and failed to find it persuasive.

The Byers' jury was instructed:

Instruction #11: A person commits the offense of deliberate homicide if he purposely or knowingly causes the death of another human being. (Taken from § 45-5-102(1), MCA.)

Instruction #12: A person acts purposely when it is his conscious object to engage in conduct of that nature or to cause such a result. (Taken from § 45-2-101(58), MCA.)

Instruction #13: A person acts knowingly when he is aware of his conduct or when he is aware that it is highly probable that a result will be caused by his conduct. (Taken from § 45-2-101(33), MCA.)

Byers' arguments have been made and considered previously by this Court in State v. Sigler (1984), 210 Mont. 248, 688 P.2d 749. In Sigler, the defendant was accused of deliberate homicide after having hit or kicked a 19-month old child, causing his bowels to perforate, killing him. The Sigler jury was similarly instructed:

Instruction #12: A person acts purposely with respect to a result or to conduct described by statute defining an

24

offense if it is his conscious object to engage in that conduct or to cause that result.

Instruction #13: A person acts knowingly with respect to conduct when he is aware of his conduct. A person acts knowingly with respect to the result of conduct described by a statute defining an offense when he is aware that it is highly probable that such result will be caused by his conduct.

Instruction #14: A person commits the offense of deliberate homicide if he purposely or knowingly causes the death of another human being.

Sigler, 210 Mont. at 257-258, 688 P.2d at 749, 754.

The instructions given by the District Court in Byers were similar to those given in Sigler and were taken from the same statutes. We determined in Sigler that the court had correctly instructed the jury. There, as here, the jury was also instructed that the State had to prove all elements of the crime.

Byers' argument that the Sigler case should be overruled because it is not the law is unpersuasive. We have considered his argument in previous cases and have found instructions like those given in Byers to be an adequate statement of the law. Byers' argument on this point is that the court's interpretation of the law in Sigler relieves the State of proving that the defendant had the required intent to cause the death of another human being. Such intent is no longer required in this state:

"Purposely" and "knowingly" have replaced the concepts of malice and intent known to our former law. . . . In short, the voluntary act of a person, if not justifiable . . . . knowingly, purposely, or negligently done is criminal homicide if it causes the death of another human being. . . .Proof of cause is a primary duty of the State, and a necessary element to be found by the jury for a proper conviction in a criminal homicide case. (Emphasis in original.)

25

Sigler, 210 Mont. at 258, 688 P.2d at 754. And more recently we have stated:

> It is no longer necessary to prove specific intent as an element of the crime unless the statute defining the offense requires as an element thereof specific purpose. . . .As the trial court noted in refusing defendant's proffered instructions, a defendant can properly be convicted of deliberate homicide even though he may not have intended that the death result from the act where he contemplated the same kind of harm or injury to the victim. . . .

State v. Van Dyken (1990), 242 Mont. 415, 434, 791 P.2d 1350, 1362, cert. denied, 111 S.Ct. 297.

Contrary to Byers' argument, the Sigler-type instructions have been considered on numerous occasions by this Court and we have consistently found them to be an accurate reflection of the law:

> Sigler is well-settled law and its holding has been affirmed often by this Court. See State v. Blalock (1988),232 Mont. 223, 756 P.2d 454; State v. McKimmie (1988), 232 Mont. 227, 756 P.2d 1135; State v. Ballenger (1987), 227 Mont. 308, 738 P.2d 1291; State v. Koepplin (1984), 213 Mont. 55, 689 P.2d 921. We once again affirm the Sigler holding and find that the trial court correctly instructed the jury concerning mental state.

Van Dyken, 242 Mont. at 434, 791 P.2d at 1362.

In Sigler we gave an example of the effect of deletion of specific intent in the current law:

> . . . . proof beyond a reasonable doubt that a defendant consciously shot another with a gun where no circumstances of mitigation, excuse or justification appear, and the other died from the gunshot, will suffice to convict the defendant of deliberate homicide, without proof that death was the intended result by the defendant . . . .Our criminal law proscribes purposely doing an act which causes the death of another; it also proscribes doing an act with the conscious object of causing the death of another. In the former, death may not be the intended result, but if the act which causes the death is done purposely, deliberate homicide is committed. (Emphasis added.)

26

Sigler, 210 Mont. at 260, 688 P.2d at 755.   Such a statement of the law was taken directly from the law itself.   At the time of the shootings, the definition of "purposely" was:

> "Purpose"--a person acts purposely with respect to a result or to conduct described by a statute defining an offense if it is his <u>conscious object to engage in that conduct or to cause that result.</u>

Section 45-2-101(58), MCA.   The statute clearly provides two ways to act with purpose:  1) consciously engaging in a certain conduct, or 2) consciously attempting to cause a result.   Section 45-5-102, MCA, provides:

> (1) A person commits the offense of deliberate homicide if:
>         (a)   he purposely or knowingly causes the death of another human being . . .

Section 45-2-201, MCA, describes the causal relation between conduct and result as follows:

> **Causal relationship between conduct and result.**   (1) <u>Conduct is the cause of a result if:</u>
>         (a) <u>without the conduct the result would not have occurred;</u> and
>         (b) and additional causal requirements imposed by the specific statute defining the offense are satisfied.
>         (2)   If purposely or knowingly causing a result is an element of an offense and the result is not within the contemplation or purpose of the offender, either element can nevertheless be established if:
>         (a)   the result differs from that contemplated only in the respect that a different person or different property is affected or that the injury or harm caused is less than contemplated; or (b)   the result involves the same kind of harm or injury as contemplated but the precise harm or injury was different or occurred in a different way, unless the actual result is too remote or accidental to have a bearing on the offender's liability or on the gravity of the offense.   (Emphasis added.)

Because the law specifically indicates an inter-connectedness between conduct and result in deliberate homicide, this Court has

27

consistently interpreted the law on its face since _Sigler_: the defendant need only have the purpose to engage in a certain conduct. If that conduct causes death, defendant can be charged with deliberate homicide.

The deliberate homicide statute does not require only a "result" as Byers argues. If defendant engages in any conduct "purposely" and death is a "result", according to the statutes now in effect in this State, the defendant can be found guilty of deliberate homicide. Such was the case in _Sigler_.

We conclude that Byers is in error in contending that the State had to prove that Byers intended to cause the death of another human being. We also conclude that the _Byers_' instructions are a correct reflection of the current law in this State.

We hold that the District Court did not err by instructing the jury that it could convict Byers if it merely found that Byers was aware of his conduct or if he had the conscious object to engage in conduct of a particular nature.

## VIII

Did the District Court err by instructing the jury that voluntary intoxication is not a defense to criminal activity?

Byers argues that the voluntary intoxication statute is unconstitutional because its use relieves the State of its burden of proving the elements of an offense. Byers contends that he never used intoxication as a defense because there exists no connection between his use of alcohol and the shootings. Byers asserts that his conviction must be overturned because of the use of this instruction by the court.

28

The State argues that the court did not err in giving the intoxication instruction because testimony was presented at trial which indicated that Byers was intoxicated. Further, according to the State, the instruction regarding intoxication did not override the instruction regarding the State's burden of proving the elements of the crimes.

The jury was instructed:

> A person who is in an intoxicated condition is criminally responsible for his conduct and an intoxicated condition is not a defense to any offense and may not be taken into consideration in determining the existence of a mental state which is an element of the offense unless the defendant proves that he did not know that it was an intoxicating substance when he consumed the substance causing the condition.

Jury instruction #22.

During the State's case, one of Byers' friends in the dormitory on the Montana State University campus testified that Byers had drunk almost an entire bottle of wine on the night of the shootings and that he was "drunk" and was "slurring his words" shortly before the shootings occurred. The court concluded it was proper to give the jury instruction. The trial court must determine which instructions are necessary in a particular case and should instruct the jury on every theory having support in the evidence. State v. Goodwin (1991), 249 Mont. 1, 813 P.2d 953.

Byers' argument that the intoxication instruction relieved the State of the burden of proving beyond a reasonable doubt all of the elements of the offense is not persuasive. The court was very clear in directing the jury that "[t]he state of Montana has the burden of proving the guilt of the defendant beyond a reasonable

29

doubt." (Instruction #2.) The same instruction told the jury that "[t]he defendant is presumed to be innocent of the charge against him . . . . throughout every stage of the trial and during your deliberations on the verdict."

We review jury instructions as a whole; instructions are deemed to be sufficient if they fully and fairly present applicable law. State v. Webb (1992), 252 Mont. 248, 828 P.2d 1351. A review of the instructions as a whole reveals that the court fully instructed on all theories pertinent to the case and fairly presented the current state of the law to the jury. We conclude that the jury instructions were sufficient.

We hold that the District Court did not err by instructing the jury that voluntary intoxication is not a defense to criminal activity.

IX

Did the District Court err by refusing to include voluntariness in instructions 17 and 18?

Byers points out that the court did not include an instruction on voluntariness with the jury instructions giving the elements of the crime. Byers argues that because the voluntariness instruction was separated from the instructions on elements of the crime, the jury was confused and may not have considered it. According to Byers, such lack of consideration was prejudicial to his case.

The State contends that the jury was properly instructed. According to the State, a voluntary act does not refer to psychological impairment but to a physical act. Because of this, the State contends that it was proper to separate the voluntary

30

instruction from the instruction stating the elements of the crime.

Instruction #10 stated:

> In addition to the particular states of mind which are essential elements for the offenses charged or included in this case, the State must prove beyond a reasonable doubt that the Defendant acted voluntarily. An "act" has its usual and ordinary meaning and includes any bodily movement. The term "voluntary" means the act is the product of the effort or determination of the actor, either conscious or habitual. Acts which are not voluntary are reflexes, convulsions, bodily movements during unconsciousness or sleep, or conduct during hypnosis, or any other bodily movement that otherwise is not a product of effort or determination either conscious or habitual. (Emphasis added.)

This instruction clearly puts the burden on the State to prove voluntariness. Further, the next three instructions immediately following the above instruction are: 12) deliberate homicide must be done purposely or knowingly, 13) definition of purposely, 14) definition of knowingly. There is no real separation here. These instructions are all individual elements and portrayed as such.

The court restated elements of instructions 12, 13, 14 again in instructions 17 and 18. These latter two instructions combined the possibility of mitigated deliberate homicide and evidence of extreme mental or emotional stress:

> Instruction #17: To convict the defendant of the offense of deliberate homicide, under Count I, the State must prove the following elements:
>
> 1. That the defendant caused the death of James Allen Clevenger [Instruction #18 was identical but inserted the name Brian Peter Boeder], a human being; and
> 2. That the defendant acted purposely or knowingly.
>
> The defendant has asserted the affirmative defense of mitigated deliberate homicide which requires proof by a preponderance of the evidence that the defendant acted under the influence of extreme mental or emotional stress

31

for which there was a reasonable explanation or excuse.

If you find from your consideration of the evidence that all of elements number 1 and 2 have been proved beyond a reasonable doubt, and the defendant has not proved extreme mental or emotional stress, by a preponderance of the evidence, then you should find the defendant guilty of deliberate homicide.

If you find from your consideration of the evidence that all of elements number 1 and 2 have been proved beyond a reasonable doubt, and the defendant has proved extreme mental or emotional stress, by a preponderance of the evidence, then you should find the defendant guilty of mitigated deliberate homicide.

If you find from your consideration of the evidence that either element[s] number 1 or number 2 has not been proven beyond a reasonable doubt, then you should find the defendant not guilty.

If you find from your consideration of the evidence that the defendant did not have the required mental state of purposely or knowingly described in element number 2, because of mental disease or defect then you should find the defendant not guilty by reason of mental disease or defect.

The court did not include in instructions 17 or 18 any mention of voluntariness. Neither did anything in these two instructions negate the instruction already given on voluntariness.

Jury instructions must be read and reviewed as a whole and if they fairly and fully reflect the law, they will be found sufficient. Goodwin, 249 Mont. at 13, 813 P.2d at 961. We conclude that the instructions as given adequately reflect the law and the placement of the voluntariness instruction is not prejudicial to defendant.

We hold that the District Court did not err by refusing to include voluntariness in instructions 17 and 18.

32

Did the District Court make an improper comment on the evidence when it instructed the jury that consciousness of guilt could be inferred from flight?

The court instructed the jury:

> If you are satisfied that the crime charged in the information has been committed by someone, then you may take into consideration any testimony showing, or tending to show, flight by the defendant. This testimony may be considered by the jury as a circumstance tending to prove a consciousness of guilt, <u>but is not sufficient of itself to prove guilt</u>. The weight to be given such circumstance and significance if any, to be attached to it, are matters for the jury to determine. (Emphasis added.)

Instruction #21.

Byers argues that many jurisdictions have eliminated a "flight" instruction. Byers' contention is that the instruction when given is an improper comment by the court on a single piece of evidence. It works, according to Byers, to invade the province of the jury and essentially directs a verdict for the State. Byers further argues that in a situation as here where the only issue is mental state, defined as consciousness, a flight instruction essentially tells the jury that defendant was "conscious" of his guilt if he fled the scene.

The State argues that this Court has upheld the use of the flight instruction in situations where it is supported by evidence. According to the State, there is no dispute that Byers fled from the scene of the crime and on that basis the instruction was proper.

The evidence introduced at trial is uncontroverted that Byers left the Montana State University campus in the early morning

hours and drove to East Helena, Montana, where he was apprehended. Thus, the facts of this case make the flight instruction appropriate.

Yet, Byers contends that we should once again consider whether the flight instruction is an appropriate statement of the law. The instruction was taken from the Montana Criminal Jury Instructions 1-019. It has been used with approval in numerous cases. See State v. Campbell (1990), 241 Mont. 323, 787 P.2d 329; State v. Kills on Top (1990), 241 Mont. 378, 787 P.2d 336; State v. Burk (1988), 234 Mont. 119, 761 P.2d 825; State v. Charlo (1987), 226 Mont. 213, 735 P.2d 278.

The use of the instruction here is no less appropriate than in the preceding cases. It is important to note here that the jury was specifically told in this instruction that it was their domain to weigh any evidence of flight. They were also instructed that evidence of flight alone was not enough to show guilt. Thus, Byers' argument that the use of this instruction acted to direct a verdict where the only issue is his mental state is not correct. It is the trial court's responsibility to give the jury the legal tools that it needs to make a decision. We conclude it did that here. The court's use of the flight instruction under the facts of this case was an accurate reflection of the present law.

We, therefore, hold that the District Court did not improperly comment on the evidence when it instructed the jury that consciousness of guilt could be inferred from flight.

Did the sentencing judge err when he imposed a separate, consecutive sentence for weapon use even though the offense of weapon use was not charged?

Byers argues he was charged with two counts of deliberate homicide, but was given three sentences. Because of the wording of the weapon enhancement statute, Byers asserts he was denied due process because he was not charged with this third offense.

The State contends the weapons enhancement statute does not constitute a separate offense. According to the State, this Court has already concluded the enhancement statute does not circumvent due process. The State argues that our Ninth Circuit has also reached the same conclusion.

Section 46-18-221, MCA, reads:

**Additional sentence for offenses committed with a dangerous weapon.** (1) A person who has been found guilty of any offense and who, while engaged in the commission of the offense, knowingly displayed, brandished, or otherwise used a firearm, destructive device, as defined in 45-8-332(1), or other dangerous weapon shall, in addition to the punishment provided for the commission of such offense, be sentenced to a term of imprisonment in the state prison of not less than 2 years or more than 10 years, except as provided in 46-18-222.
(2) A person convicted of a second or subsequent offense under this section shall, in addition to the punishment provided for the commission of the present offense, be sentenced to a term of imprisonment in the state prison of not less than 4 years or more than 20 years, except as provided in 46-18-222.

Byers' argument concerning a separate offense was made in State v. Krantz (1990), 241 Mont. 501, 788 P.2d 298. There we stated that the United States Supreme Court has given the states great latitude in defining the elements of a crime and the factors mitigating or aggravating sentencing. Krantz, 241 Mont. at 508,

788 P.2d at 302; citing Patterson v. New York (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281.

Further, we stated in Krantz:

> The Montana weapon enhancement statue contains a number of elements similar to those found in substantive criminal statutes, but those elements do not make it a separate crime. The enhancement statute contains a recidivist provision, requires a mental state of knowingly, and may require a finding of fact, use of a weapon, not necessary to establish guilt of the underlying crime. The recidivist provision carries out the statute's purpose by limiting the sentencing court's discretion in imposing increased punishment for repeat offenders. The mens rea requirement protects the defendant by imposing on the court an additional and appropriate finding in determining weapon usage. All sentencing factors may, and often do, require the court to consider facts not established during trial. These elements are as much pertinent and necessary attributes of traditional sentencing considerations as they are attributes of substantive crimes.
>
> . . .
>
> This Court has repeatedly held that Montana's weapon enhancement statute does not create a separate crime or element of a crime. (cites omitted) The Montana legislature has chosen a scheme which makes dangerous offender status and use of a weapon sentencing factors. So long as that scheme remains constitutional, it is not the province of this Court to transmute these statutory factors into separate crimes or elements of crimes.

Krantz, 241 Mont. at 511-512, 788 P.2d at 304-305.

Again, we conclude that Byers was afforded due process because the State clearly had the burden of proof of all elements of the crime. Further, the legislative decision to make weapon enhancement a sentencing factor and not a separate offense, does not violate Byers' due process.

We hold the sentencing judge did not err in imposing a separate, consecutive sentence for weapon use even though the

36

offense of weapon use was not charged.

XII

Did the District Court improperly impose a 15 year sentence for weapon use?

Byers argues that Montana should adopt the California "single incident" rule. According to Byers, it serves no purpose to sentence a defendant to so many years for each offense when all offenses were committed at one time. This is so, claims Byers, because the purpose of weapon enhancement statutes is to discourage future use of weapons.

The State argues that the Court must consider the language of the statute and determine that it refers to a single "offense" not a single "transaction." The court sentenced Byers:

> For the use of a weapon in the commission of the two homicides, the herein imposed sentence [75 years per each count of homicide] is enhanced by an additional aggregate term of 15 years, to run consecutive to the sentences imposed in I and II.

This Court's responsibility involving statutes is to interpret them as they exist and not to insert terms, or restrictions, clearly not present. State v. Crane (1990), 240 Mont. 235, 784 P.2d 901. Our enhancement statute states in pertinent part:

> A person who has been found guilty of any offense and who, while engaged in the commission of the offense, knowingly displayed, brandished, or otherwise used a firearm, destructive device, as defined in 45-8-332(1), or other dangerous weapon shall, in addition to the punishment provided for the commission of such offense, be sentenced to a term of imprisonment in the state prison of not less than 2 years or more than 10 years, except as provided in 46-18-222. (Emphasis added.)

Section 46-18-221(1), MCA.

The language on the face of this statute clearly indicates an

37

enhancement for a single offense.  Were we to interpret this statute as California has, we would be inserting a restriction which is nowhere herein indicated in any way.

We conclude that Montana's weapon enhancement statute dictates an enhancement of from 2 to 10 years for each offense and in no way restricts the sentencing considerations to a single period of time.

Byers next argues that the 15 year sentence, stated in the aggregate, is a general sentence.  Such is clearly not the case. A "general" sentence is one which is undivided; in other words, it is not "specific" as to each crime or each count.  The sentencing judge unequivocally assessed Byers 75 years for each count of deliberate homicide:

I.

For Brett Donald Byers' conviction for the killing of James Clevenger, he is hereby sentenced to the Montana State Prison for a term of 75 years.

II.

For Brett Donald Byers' conviction for the  killing of Brian Boeder, he is hereby sentenced to the Montana State Prison for a term of 75 years.

III.

Each of the prison terms to run consecutive.

The specific term of 15 years was assessed over and above the aforementioned specific terms of 75 years.  Therefore, there is nothing "general" concerning Byers' sentence.  Byers argues that the court should have divided the 15-year enhancement between the two offenses.  In this situation where both crimes are the same, the use of an aggregate sentence within the parameters set out in

38

§ 46-18-221, MCA, is sufficient.

We hold the District Court properly sentenced the appellant pursuant to the weapon enhancement statute.

## XIII

Should Byers' conviction be reversed?

This Court will not set aside a conviction, if after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Matt (1991), 249 Mont. 136, 814 P.2d 52. This Court has carefully considered the trial transcript. We conclude that any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. We hold that Byers' conviction should not be reversed.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

39

Justice Terry N. Trieweiler specially concurring in part and dissenting in part.

I concur with the majority's conclusions regarding Issues 1, 4, 5, and 8-11.

I specially concur with those parts of the majority opinion which relate to Issues 3, 6, and 12. However, although I concur with the result reached, I do not agree with all that is said in the majority opinion with regard to these issues.

I dissent from the majority's conclusions as they relate to Issues 2 and 7.

With regard to Issue 2, I dissent from the majority's conclusion that Montana's treatment of the insanity defense does not violate defendant's right to due process. For the reasons stated in my dissent to the majority's opinion in *State v. Cowan* (Mont. 1993), ___ P.2d ___, ___ St. Rep. ___, I conclude that Montana's abolition of the insanity defense in 1979 violated defendant's right to due process of law guaranteed under the Fourteenth Amendment to the United States Constitution, and Article II, Section 17, of the Montana Constitution.

Anyone unfamiliar with Montana's treatment of insane people who are charged with crimes would believe, based on the majority opinion, that they are treated more favorably now than before the statutory changes which were made in 1979. That is not correct.

Based on the Legislature's abolition of the insanity defense in 1979, and this Court's approval of that change in *State v. Korell*

40

(1984), 213 Mont. 316, 690 P.2d 992, persons in Montana can be convicted of serious crimes and sentenced to confinement in the State Prison, even though at the time of the acts with which they are charged they were unable to appreciate the criminality of their conduct or were unable to conform their conduct to the requirements of the law because of mental illness. In addition to Montana, only the states of Utah and Idaho allow punishment of the mentally ill, and no U.S. Supreme Court decision has ever held that such treatment of the mentally ill satisfies the due process clause of the Fourteenth Amendment to the United States Constitution.

I conclude that the majority's reliance on *Leland v. State of Oregon* (1952), 343 U.S. 790, 72 S. Ct. 1002, 96 L. Ed. 1302, is misplaced. While the U.S. Supreme Court did hold in that case that the defendant was not constitutionally entitled to a specific form of the insanity defense, it is implicit from that decision that some form of an insanity defense is required by the due process clause. In fact, subsequent to this Court's decision in *Korell*, the California Supreme Court cited *Leland* for exactly the opposite purpose for which it is cited by this Court. In *People v. Skinner* (Cal. 1985), 704 P.2d 752, the California Supreme Court, while discussing the due process dimensions of the insanity defense, stated that:

> Because mens rea or wrongful intent is a fundamental aspect of criminal law, the suggestion that a defendant whose mental illness results in inability to appreciate that his act is wrongful could be punished by death or imprisonment raises serious questions of constitutional dimension under both the due process and cruel and unusual punishment provisions of the Constitution. In

41

*Leland v. Oregon* (1952), 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302, the court upheld an Oregon law placing the burden of proving insanity beyond a reasonable doubt on the defendant and affirmed the right of the state to formulate the applicable test of legal insanity. In so doing, however, the court measured the law under due process standards, concluding that the irresistible impulse extension of traditional insanity test was not "'implicit in the concept of ordered liberty.'" (343 U.S. at p. 801, 72 S.Ct. at 1009). The court thus seemingly accepted the proposition that the insanity defense, in some formulation, *is* required by due process. (See also *Robinson v. California* (1962), 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758, suggesting that punishment for the status of being mentally ill would constitute cruel and unusual punishment.) Scholars, too, suggest that abolition of the traditional insanity defense may be constitutionally impermissible if the result would be imposition of punishment on a mentally ill person for acts done without criminal intent. (See Robitscher & Haynes, *In Defense of the Insanity Defense* (1982) 31 Emory L.J. 9; Note, *The Proposed Federal Insanity Defense: Should the Quality of Mercy Suffer for the Sake of Safety* (1984) 22 Am.Crim.L.Rev. 49.)

This court suggested a similar view in *People v. Coleman* (1942), 20 Cal.2d 399, 407, 126 P.2d 349, where we observed: "Obviously an insane person accused of crime would be inhumanely dealt with if his insanity were considered merely to reduce the degree of his crime or the punishment therefor."

*Skinner,* 704 P.2d at 757-58.

Montana's statutory scheme for dealing with mental illness does exactly what the California Supreme Court suggests would violate due process and cruel and unusual punishment provisions of the Constitution. It allows for conviction and punishment of those who are unable to appreciate the criminality of their conduct, and it substitutes for the insanity defense the mere option of the district court to take mental illness into consideration when

42

deciding the degree of punishment or nature of the defendant's confinement.

While evidence of mental disease or defect is admissible to prove that a defendant did not have a state of mind that is an element of the offense, it is clear that Montana's law does not take into consideration the defendant's ability to appreciate the criminality of his conduct or conform his conduct to the law. The only state of mind that had to be proven to convict the defendant in this case was that he acted knowingly and purposely at the time of the illegal conduct with which he is charged. Based on Montana's definitions of knowingly and purposely, he could act with both states of mind and still not appreciate the criminality of his conduct nor be able to conform his conduct to the law.

The majority's conclusion that abolition of the insanity defense does not violate the due process clauses of the Montana or Federal Constitutions is based largely on its prior decision in *Korell*, and that decision's interpretation of *Leland*.

The inadequacy of this Court's decision in *Korell*, and the inaccuracy of its analysis of *Leland* is thoroughly set forth by the dissenting opinion of Justice McDevitt in *State v. Searcy* (Idaho 1990), 798 P.2d 914. I agree with that analysis, and would follow it in this case.

The only reported decision outside of Montana which I am familiar with and which specifically upholds abolition of the insanity defense is the majority opinion in *Searcy*. In his

43

well-documented opinion dissenting from that decision, Justice McDevitt made several important points.

First, he examined the various tests for due process that have been set forth over the years. He observed that:

> In *Palko v. Connecticut*, 302 U.S. 319, 324-25, 58 S.Ct. 149, 151-52, 82 L.Ed. 288 (1937), Justice Cardozo wrote that those particulars of the Bill of Rights which must be held to apply as against the States through the Fourteenth Amendment Due Process Clause are those which "have been found to be implicit in the concept of ordered liberty, . . ." such that "a fair and enlightened system of justice would be impossible without them."

*Searcy*, 798 P.2d at 927.

He noted that:

> The underlying theme of these various formulations of "due process" is a sense of historical precedent upon which American institutions were founded and our continuing legal traditions. Thus, the proper focus in evaluating the place of a particular doctrine in the concept of due process is the pervasiveness of the doctrine in the history of the common law. A review of the extensive history of the insanity defense in the law of England and the United States leads to the conclusion that due process does require the availability of that defense to criminal defendants.

*Searcy*, 798 P.2d at 928.

As noted in Justice McDevitt's dissent, the insanity defense has existed as an excuse to crime from the time of the reign of Edward I during the 13th Century, and was well established by the 16th Century. *Searcy*, 798 P.2d at 928-29. He pointed out that as early as the 18th Century there was recorded case law to the effect that a man deprived of reason cannot be guilty. The jury was so instructed in *Rex v. Arnold*, 16 How.St.Tr. 695 (1724). American cases

closely tracked English law from the time that insanity was first considered as a defense in this Country's courts. *In re Clark*, 1 City Hall Recorder (N.Y.) 176 (1816), and *In re Ball*, 2 City Hall Recorder (N.Y.) 85 (1817).

Then, in 1843, *M'Naughten's Case*, 8 Eng.Rep. 718 (H.L. 1843), was decided. That case provided that a person suffering from disease of the mind, to the extent that they did not know the nature and quality of their conduct, or did not know that what they were doing was wrong, could not be guilty of a crime. The *M'Naughten* rule, in some form or another, has been followed in virtually every American jurisdiction until 1979. However, whether following the *M'Naughten* rule, or some other variation of the insanity defense, McDevitt points out that the appropriateness of the defense has rarely been questioned.

Second, McDevitt pointed out that there were three legislative attempts to abolish the insanity defense between 1910 and 1931, but that each of those legislative enactments were overturned by the state supreme courts where they were attempted. *Searcy*, 798 P.2d at 932. Referring to this Court's discussion of those decisions in *Korell*, Justice McDevitt pointed out that:

> The Montana Supreme Court, in its recent decision upholding the 1979 abolition of the defense in Montana, effortlessly distinguished those three cases because "[t]hey interpret statutes that precluded *any* trial testimony of mental condition, including that which would cast doubt on the defendant's state of mind at the time he committed the charged offense." *Korell*, 213 Mont. at 329, 690 P.2d at 999 (emphasis in original). The *Korell*

45

court felt that Montana's allowance for psychiatric evidence going to the issue of *mens rea* at trial removed any precedential value from those three prior cases. However, I believe that two of those cases have greater applicability to the issues faced in *Korell* and by this Court than the Montana Supreme Court would allow.

*Searcy*, 798 P.2d at 932.

For the reasons mentioned by the dissent in *Searcy*, I agree.

Finally, the dissenting opinion in *Searcy* points out that:

> Another, albeit less authoritative, test of whether a particular doctrine is "implicit in the concept of ordered liberty" other than the history of the legal concept, is the unanimity with which the doctrine is adopted among American jurisdictions. With the exception of the three attempted legislative abolitions of the insanity defense noted above, and the recent rejections of the defense in Montana (1979), Idaho (1982), and Utah (1983), the insanity defense has been universally accepted in all American jurisdictions throughout this nation's history.

*Searcy*, 798 P.2d at 934.

Based upon the foregoing, and based on the inapplicability of those authorities relied upon by the majority of the Idaho Supreme Court and the majority of this Court, the dissent in *Searcy* concluded that:

> I believe it is evident that the defense has an independent existence of sufficient duration and significance to entitle it to a place in our American concept of "ordered liberty."

*Searcy*, 798 P.2d at 927.

I agree.

I believe as strongly as anyone that innocent people must be protected from those who are a danger to society, whether their behavior results from mental disease or simply an antisocial

46

personality. However, the alternative to imprisoning those whose behavior results from insanity, over which they have no control, is not to turn them loose on society. Our law prior to 1979 provided that when a defendant is acquitted based on the defense of mental disease or defect, he or she must be committed to the custody of the superintendent of the Montana State Hospital for so long as he or she remains a threat to society. Section 95-508, R.C.M. (1947). That procedural safeguard has been carried forward to our current statutory scheme. Section 46-14-301, MCA.

I do not mean to infer from this dissent that this defendant could have satisfied the burden of proof with regard to Montana's former insanity defense. However, I conclude that because he was denied the opportunity to have a jury decide whether, due to mental disease or defect, he was unable to appreciate the criminality of his conduct or conform his conduct to the requirements of the law, he was denied due process of law.

I also dissent from the majority's conclusion that the District Court did not err when it instructed the jury that defendant could be convicted of deliberate homicide if his conduct was purposeful and knowing, regardless of whether he intended the results of his conduct.

The crime of deliberate homicide is defined at § 45-5-102, MCA. That statute provides that:

(1) A person commits the offense of deliberate homicide if:

(a) he purposely or knowingly causes the death of another human being . . . . [Emphasis added.]

47

The jury was correctly instructed in the District Court's Instruction No. 11 that "[a] person commits the offense of deliberate homicide if he purposely or knowingly <u>causes</u> the death of another human being."

However, the jury was incorrectly instructed by the District Court in Instruction Nos. 17 and 18. In Instruction No. 17, the jury was told that the State could convict the defendant of the offense of deliberate homicide if it merely proved the following elements:

> 1. That the defendant caused the death of James Allen Clevenger, a human being; and
>
> 2. That the defendant acted purposely or knowingly.

Instruction No. 18 was a mirror reflection of No. 17, except that it referred to the other victim, Brian Peter Boeder.

In other words, although by statute in Montana, the crime of deliberate homicide is limited to the knowing or purposeful causation of someone's death, these instructions, and this Court's previous decision in *State v. Sigler* (1984), 210 Mont. 248, 688 P.2d 749, allow conviction for deliberate homicide where a defendant acts knowingly or purposely, even though it was not his purpose to cause anyone's death and he did not know that death would result from his conduct. This is an example of judicial activism in the extreme. I agree with Justice Morrison's dissent to *Sigler* wherein he states that:

> By judicial fiat, the law in Montana is that a defendant who acts with purpose and accidently causes the

48

death of another, is guilty of deliberate homicide. In other words, if one strikes another on the jaw with his fist, and the one struck falls to the ground striking his head upon the curbing, and death ensues, the offense is deliberate homicide.

This case perfectly illustrates the evil inherent in result-oriented decision making. Defendant Sigler's conduct may well have resulted in the death of an infant child. If believed, the State's case leaves little room for sympathy for Sigler. These inflammatory factual settings provide the genesis for irrational and unworkable legal principles.

*Sigler*, 688 P.2d at 756.

Based on the facts in this case, correct instructions regarding the required mental state may not have changed the outcome. However, this Court's willingness to freely amend the law in order to accomplish a desired result will have potentially dangerous consequences in the future. While this may be a popular approach, I decline to participate.

For these reasons, I dissent to Issues 2 and 7 of the majority opinion.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing concurrence and dissent.

_____
Justice

October 6, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


Alexander "Zander" Blewett
HOYT & BLEWETT
501 2nd Ave.
Great Falls, MT 59403

WENDY HOLTON
Attorney at Law
1219 11th Ave.
Helena, MT 59601

HON. MARC RACICOT, Attorney General
Barbara Harris, Assistant
Justice Bldg.
Helena, MT 59620

Mike Salvagni, County Attorney
Gallatin County Attorney's Office
615 South 16th Avenue, Rm 100
Bozeman, MT 59715


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy