MR. CHIEF JUSTICE HASWELL
delivered the Opinion of the Court.
Jerry Korell appeals the judgment of the Ravalli County District Court finding him guilty of attempted deliberate homicide and aggravated assault. Korell was sentenced to concurrent sentences of thirty-five and fifteen years at the Montana State Prison. Korell’s defense at trial was that he lacked the requisite criminal mental state by reason of his insanity. On appeal his primary contention is that the Montana statutory scheme deprived him of a constitutional right to raise insanity as an independent defense.
Jerry Korell is a Viet Nam veteran who had several disturbing experiences during his tour of duty. The exact nature of the trauma was never fully documented. Friends and family agree that he was a different person when he returned from the service. Between Korell’s honorable discharge in 1970 and the present events, he was twice admitted to VA hospitals for psychological problems and treated with anti-psychotic drugs. In 1976 he was jailed briefly in Boise, Idaho, for harassing and threatening the late Senator Frank Church.
The basic nature of Korell’s problems was that he would periodically slip into paranoid phases during which he had trouble relating to male authority figures. His mental health varied dramatically. In the poorer times his family entertained thoughts about having him civilly committed. His VA hospitalizations were voluntary and neither of the stays were of such length that he was fully evaluated or treated.
In 1980 Korell entered a community college program for echocardiology in Spokane, Washington. Echocardiology is *320 the skill associated with recording and interpreting sonograms of the heart for diagnostic purposes. In March 1982 he was sent to Missoula to serve a clinical externship at St. Patrick’s Hospital. Korell’s supervisor at the hospital was Greg Lockwood, the eventual victim of this crime.
Korell’s relationship with Lockwood deteriorated for a variety of work-related reasons. Foremost was Korell’s belief that he was worked excessively by Lockwood. At this time Korell was subjected to what expert testimony labeled psychological stressors: a divorce by his wife, financial problems and the pressures of graduation requirements.
In April 1982 Korell wrote a letter to the hospital administrator complaining about his supervisor, Lockwood. Korell was transferred to an externship in Spokane, and Lockwood was placed on probation. Both men retained very bitter feelings about the incident. Lockwood stated to friends he would see to it that Korell was never hired anywhere in echocardiology. Korell may have learned of Lockwood’s statements.
Korell’s actions in the next two months indicate a great deal of confusion. He set fire to a laundromat because he lost nine quarters in a machine and was tired of being ripped off. He set fire to a former home of his wife because she had bad feelings about it.
Released on bail from these incidents, he returned to Missoula in June 1982. Psychiatric testimony introduced at trial indicates that Korell felt he had to kill Lockwood before Lockwood killed him. He removed a handgun from a friend’s home, had another acquaintance purchase ammunition, and on the evening of June 25, 1982, drove to the Lockwood home in the Eagle Watch area of the Bitterroot Valley. Shirley Lockwood, Greg’s wife, saw the unfamiliar vehicle approach the house. Greg Lockwood was lying on the living room floor at the time watching television. Korell entered the house through a side door and began firing. Although wounded, Greg Lockwood managed to engage the defendant in a struggle. A shot was fired in the direction of *321 Lockwood’s wife. Korell grabbed a kitchen knife and both men were further injured before Lockwood was able to subdue Korell.
Korell was charged with attempted deliberate homicide and aggravated assault. The defendant gave notice of his intent to rely on a mental disease or defect to prove that he did not have the particular state of mind which is an essential element of the offense charged. Prior to trial he sought a writ of supervisory control declaring that he had a right to rely on the defense that he was suffering from a mental disease or defect at the time he committed the acts charged. The writ was denied by this court on December 20, 1982, and the case proceeded to trial.
Several psychologists and psychiatrists testified on Korell’s mental condition. The defense sought to establish by its expert witnesses and numerous character witnesses that Korell was a disturbed man who was psychotic at the time the crimes were committed. It was argued that his actions when he entered the Lockwood home were not voluntary acts. The State produced its own expert witnesses who testified on Korell’s mental condition. Four doctors testified in all, two for the prosecution and two for the defense. Three of the four stated Korell had the capacity to act knowingly or purposely, the requisite mental state for the offenses, when he entered the Lockwood home.
Without giving prior notice, the State produced Cedric Hames as a rebuttal witness who testified that he purchased ammunition for the defendant several days before the shooting. A motion for mistrial was made by the defense. The court denied the motion but offered the defense a continuance. The offer was refused by defendant’s counsel.
In keeping with Montana’s current law on mental disease or defect, the jury was instructed that they could consider mental disease or defect only insofar as it negated the defendant’s requisite state of mind. The jury returned guilty *322 verdicts for the attempted deliberate homicide and aggravated assault.
On appeal the defendant presents the following issues:
1. Is there a constitutional right to raise insanity as an independent defense to criminal charges?
2. Was the State’s rebuttal testimony of Cedric Hames properly admitted?
3. Was the jury properly instructed on the issue of voluntariness?
4. Did the District Court fail to consider defendant’s mental condition at sentencing?
5. Did the District Court act within its discretion in awarding fees to defendant’s court-appointed attorney?
I. CONSTITUTIONAL CHALLENGE
A. Background
In 1979 the Forty-Sixth Session of the Legislature enacted House Bill 877. This Bill abolished use of the traditional insanity defense in Montana and substituted alternative procedures for considering a criminal defendant’s mental condition. Evidence of mental disease or defect is now considered at three phases of a criminal proceeding.
Before trial, evidence may be presented to show that the defendant is not fit to proceed to trial. Section 46-14-221, MCA. Anyone who is unable to understand the proceedings against him or assist in his defense may not be prosecuted. Section 46-14-103, MCA.
During trial, evidence of mental disease or defect is admissible when relevant to prove that, at the time of the offense charged, the defendant did not have the state of mind that is an element of the crime charged, e.g., that the defendant did not act purposely or knowingly. Section 46-14-102, MCA. The State retains the burden of proving each element of the offense beyond a reasonable doubt. Defendant may, of course, present evidence to contradict the State’s proof that he committed the offense and that he had the requisite state of mind at that time.
*323 Whenever the jury finds that the State has failed to prove beyond a reasonable doubt that the defendant had the requisite state of mind at the time he committed the offense, it is instructed to return a special verdict of not guilty “for the reason that due to a mental disease or defect he could not have a particular state of mind that is an essential element of the offense charged . . Section 46-14-201(2), MCA.
Finally at the dispositional stage following the trial and conviction, the sentencing judge must consider any relevant evidence presented at the trial, plus any additional evidence presented at the sentencing hearing, to determine whether the defendant was able to appreciate the criminality of his acts or to conform his conduct to the law at the time he committed the offense for which he was convicted. Section 46-14-311, MCA.
The sentencing judge’s consideration of the evidence is not the same as that of the jury. The jury determines whether the defendant committed the offense with the requisite state of mind, e.g., whether he acted purposely or knowingly. The sentencing judge determines whether, at the time the defendant committed the offense, he was able to appreciate its criminality or conform his conduct to the law.
If the court concludes the defendant was not suffering from a mental disease or defect that rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, normal, criminal sentencing procedures are invoked. Section 46-14-312(1), MCA.
Whenever the sentencing court finds the defendant was suffering from mental disease or defect which rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, mandatory minimum sentences are waived. The defendant is committed to the custody of the director of institutions and placed in an appropriate institution for custody, care and treatment not to exceed the maximum possible sentence. Section *324 46-14-312(2), MCA. As a practical matter, this means the defendant may be placed in the Warm Springs State Hospital under the alternative sentencing procedures. The institutionalized defendant may later petition the District Court for release from the hospital upon a showing that the individual has been cured of the mental disease or defect. If the petition is granted, the court must transfer the defendant to the state prison or place the defendant under alternative confinement or supervision. The length of this confinement or supervision must equal the original sentence. Section 46-14-312(3), MCA.
In summary, while Montana has abolished the traditional use of insanity as a defense, alternative procedures have been enacted to deal with insane individuals who commit criminal acts.
Much has been written concerning criminal responsibility and insanity. Professor Norval Morris commented that “[rfivers of ink, mountains of printer’s lead, forests of paper have been expended on this issue . . . .” Morris, Psychiatry and the Dangerous Criminal, 41 S.Cal.L.R. 514, 516 (1968). Yet there is a paucity of judicial opinions construing the constitutional parameters of the traditional insanity defense or the various reform proposals. This case is the first direct constitutional challenge to Montana’s abolition of the affirmative insanity defense and adoption of alternative procedures in its place.
Four opinions of this Court have addressed the post-1979 law on mental disease or defect: State v. Mercer (Mont. 1981), 625 P.2d 44, 38 St.Rep. 312; State v. Doney (Mont. 1981), 636 P.2d 1377, 38 St.Rep. 1707; State v. Zampich (Mont. 1983), [205 Mont.231,] 667 P.2d 955, 40 St.Rep. 1235; and State v. Watson (Mont. 1984), [211 Mont. 401,] 686 P.2d 879, 41 St.Rep. 1452.
In Mercer, supra, we affirmed the aggravated assault conviction of a man found guilty of attacking a school teacher. The defendant, Bryan Mercer, suffered episodic mental illness. While broad questions concerning the mental disease *325 defense were raised, we did not reach these issues. Mercer argued that sentencing to prison a man suffering from severe mental illness violates the constitutional ban against cruel and unusual punishment. We found no authority holding that imprisonment rather than medical treatment of a person who claims to be insane, but has not been adjudicated insane, constitutes cruel and unusual punishment. We held that the jury verdict convicting the defendant was supported by substantial evidence and that the defendant had failed to show any statutory or constitutional violation by the sentencing judge.
Following Mercer, this Court heard the appeal of another aggravated assault conviction in Doney supra. The defendant Doney stabbed the night clerk of a Havre hotel and relied on expert testimony during trial to show he was incapable of forming the requisite mental state of purposely or knowingly. On appeal he argued that the State was required to overcome his “preponderance of evidence” by proving his sanity beyond a reasonable doubt, as well as the fact that he had acted purposely and knowingly. We rejected that notion:
“. . . It is sufficient that the State prove beyond a reasonable doubt the existence of the mental state that is an essential element of each of the offenses charged. Implicit in the jury’s conviction is its conclusion that the defendant possessed the requisite mental state, and therefore had the capacity to form that mental state. The State has met the requirements of Montana law.” 636 P.2d at 1382.
Our holding in Doney clarified prior language in Mercer, where the majority had noted:
“. . . Therefore, the jury knew that the State had the burden of proving beyond a reasonable doubt that the defendant was sane and capable of acting purposely or knowingly at the time of the crime.” 625 P.2d at 49.
While some jurisdictions, most notably the federal courts, have given the prosecution the burden of proving the defendant’s sanity beyond a reasonable doubt, such *326 practice is not the rule in Montana. Prior to 1979, insanity was treated as an affirmative defense that had to be established by the accused by a preponderance of the evidence. State v. Caryl (1975), 168 Mont. 414, 425, 543 P.2d 389, 395. As the above discussion and our holding in Doney states, it is sufficient that the State prove beyond a reasonable doubt the requisite mental state, e.g., purposely or knowingly, that is an element of the offense charged.
The third decision of this Court to address the 1979 changes in the law on mental disease or defect was Zampich, supra. The defendant Zampich was charged with mitigated deliberate homicide for a tavern shooting in Carter, Montana. Zampich’s psychologist testified that while the defendant may have been able to act purposely or knowingly, he may not have been acting voluntarily. We upheld the conviction on the ground that a jury instruction was given stating that a voluntary act is a material element of every offense and that the instructions read as a whole properly gave the jury notice of the defendant’s theory of the case.
Finally, in Watson, supra, the defendant argued that, because the primary symptoms of his mental disease were his repeated criminal or antisocial behavior and because the jury was instructed that mental disease does not include an abnormality manifested only by repeated criminal or other antisocial conduct, the jury was misled to presume that he had the requisite state of mind at the time he committed the offenses. See Section 46-14-101, MCA.
Watson had entered two Missoula apartments, stabbed a sleeping woman thirty-five times and also stabbed a man who came to her rescue. Both victims survived the attacks. The defendant claimed a demon spirit possessed his body during the acts. The jury convicted Watson of attempted deliberate homicide, aggravated assault and burglary. In accordance with our prior decisions, this Court concluded that the jury was properly informed of the State’s burden of establishing beyond a reasonable doubt that Watson acted *327 purposely or knowingly. The conviction was affirmed.
The sentencing judge found that Watson was suffering from a serious mental disorder, but also found that Watson was capable of appreciating the criminality of his conduct or conforming his conduct to the law but chose not to do so. See Section 46-14-311, MCA. The court designated Watson a dangerous and persistent felony offender and sentenced him to 300 years imprisonment. Watson contended that his punishment was cruel and unusual in light of the fact that he suffered from a mental disorder. Relying on our prior decisions in Mercer and Doney, we upheld Watson’s sentence, which was within the statutory maximum.
Review of our case law reveals that the constitutionality of the legislature’s abolition of the affirmative defense of insanity has not previously been decided. Korell’s present challenge is based on the Fourteenth Amendment guarantee of due process of law and the Eighth Amendment prohibition against cruel and unusual punishment.
B. Due Process Considerations
1. Fundamental Rights
The due process clause of the Fourteenth Amendment was intended in part to protect certain fundamental rights long recognized under the common law. Powell v. Alabama (1932), 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158. Appellant contends that the insanity defense is so embedded in our legal history that it should be afforded status as a fundamental right. He argues that the defense was firmly established as a part of the common law long before our federal constitution was adopted and is essential to our present system of ordered liberty.
The United States Supreme Court has never held that there is a constitutional right to plea an insanity defense. Moreover, the Court has noted that the significance of the defense is properly left to the states:
“We cannot cast aside the centuries-long evolution of the *328 collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds. The doctrines of actus reus, mens rea, insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religions, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States.” Powell v. Texas (1968), 392 U.S. 514, 535-536, 88 S.Ct. 2145, 2156, 20 L.Ed.2d 1254, 1269.
An examination of the common law in a search for fundamental rights can be misleading. When looking at concepts of insanity and criminal responsibility, one discovers a continuum of changing societal values and views. Commentators and courts have reached differing conclusions on the role of the insanity defense in the history of jurisprudence.
The English jurist Stephen observed:
“. . . In very ancient times proof of madness appears not to have entitled a man to be acquitted, at least in case of murder, but to a special verdict that he committed the offense when mad. This gave him a right to a pardon. The same course was taken when the defense was killing by misadventure or in self-defense.” 2 Stephen, A History of the Criminal Law of England 151 (1883).
This early thirteenth century practice of pardoning the insane was acknowledged in our Watson decision and the historical discussion therein. Pardons were liberally granted and the practice represented a humane departure from earlier times of absolute liability for criminal acts.
Development of the mens rea concept preceded recognition of the insanity defense. The Latin phrase mens rea literally translates as “evil mind.” It has also been interpreted as guilty mind, evil intent or criminal intent. Enlightened medieval jurists developed the mens rea doctrine: without criminal intent, there can be no moral blameworthiness, *329 crime or punishment. In the words of Henrici Bracton (d. 1268): “For a crime is not committed unless the will to harm be present.” This principle has played a central role in all subsequent considerations of capacity, insanity, and moral and legal culpability.
For centuries evidence of mental illness was admitted to show the accused was incapable of forming criminal intent. Insanity did not come to be generally recognized as an affirmative defense and an independent ground for acquittal until the nineteenth century. Morris, The Criminal Responsibility of the Mentally III, 33 Syracuse L.R. 477, 500 (1982); American Medical Association, The Insanity Defense in Criminal Trials and Limitations of Psychiatric Testimony, Report of the Board of Trustees, at 27 (1983). The defense grew out of the earlier notions of mens rea.
We reject appellant’s contention that from the earliest period of the common law, insanity has been recognized as a defense. What we recognize is that one who lacks the requisite criminal state of mind may not be convicted or punished.
Three older state court decisions have found state statutes abolishing the insanity defense to be unconstitutional. State v. Lange (1929), 168 La. 958, 123 So. 639; Sinclair v. State (1931), 161 Miss. 142, 132 So. 581; State v. Strasburg (1910), 60 Wash. 106, 110 P. 1020. These decisions are distinguishable in that they interpret statutes that precluded any trial testimony of mental condition, including that which would cast doubt on the defendant’s state of mind at the time he committed the charged offense. The Montana statutes in question expressly allow evidence of mental disease or defect to be introduced to rebut proof of defendant’s state of mind. Section 46-14-102, MCA.
The United States Supreme Court refused in 1952 to accept the argument that the Due Process Clause required the use of a particular insanity test or allocation of burden of proof. Leland v. Oregon (1952), 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302. The Oregon statute upheld in Leland *330 required the defendant to prove insanity beyond a reasonable doubt. This allocation of proof was found constitutionally sound because the State retained the burden to prove the requisite state of mind and other essential criminal elements. The State’s due process burden of proof was further emphasized in In Re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. Winship established that the prosecution must prove beyond a reasonable doubt every element constituting the crime charged.
The Montana statutory scheme is consistent with the dictates of Leland and Winship. The 1979 amendments to the criminal code do not unconstitutionally shift the State’s burden of proof of the necessary elements of the offense. The State retains its traditional burden of proving all elements beyond a reasonable doubt.
2. The Delusional Defendant
In addition to asserting that the insanity defense is a fundamental constitutional right, the appellant contends that insanity is a broader concept than mens rea. Korell argues that individuals may be clearly insane yet also be capable of forming the requisite intent to commit a crime. For example, an accused may form intent to harm under a completely delusional perception of reality or act without volitional control. It is defendant’s position that the due process of these defendants is compromised by state law which permits conviction of delusional defendants and those who act without volitional control.
Addressing the delusional defendant first, we note that planning, deliberation and a studied intent are often found in cases where the defendant lacks the capacity to understand the wrongfulness of his acts. Fink & Larene, In Defense of the Insanity Defense, 62 Mich. B.J. 199 (1983). Illustrations include the assassin acting under instructions of God, the mother drowning her demonically-possessed child, and the man charging up Montana Avenue on a shooting spree believing he is Teddy Roosevelt on San Juan Hill. De *331 fendant contends that these people could properly be found guilty by a jury under current Montana law.
As some commentators have noted, the 1979 amendments to the law on mental disease or defect may actually have lowered the hurdle mentally disturbed defendants must clear to be exculpated. In order to be acquitted, the defendant need only cast a reasonable doubt in the minds of the jurors that he had the requisite mental state. See, Bender, After Abolition: The Present State of the Insanity Defense in Montana, 45 Mont. L.R. 133, 141 (1984). As a practical matter, the prosecutor who seeks a conviction of a delusional and psychotic defendant will be faced with a heavy burden of proof.
Assuming the delusional defendant is found guilty by a jury, factors of mitigation must be considered by the sentencing judge in accordance with Section 46-14-311, MCA. The fact that the proven criminal state of mind was formed by a deranged mind would certainly be considered. In addition, a defendant can be sentenced to imprisonment only after the sentencing judge specifically finds that the defendant was not suffering, at the time he committed the offense, from a mental disease that rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Section 46-14-312(1), MCA.
3. The Volitionally-Impaired Defendant
The test of mental disease or defect that was afforded defendants prior to 1979 read as follows:
“A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he is unable either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.” Section 46-14-101, MCA (1978).
It is the second prong of this standard, the volitional aspect of mental disease or defect, that appellant claims has been eliminated. He argues that there are those who lack the ability to conform their conduct to the law and that elimi *332 nation of the involuntariness defense is unconstitutional.
The volitional aspect of mental disease or defect has not been eliminated from our criminal law. Consideration of a defendant’s ability to conform his conduct to the law has been moved from the jury to the sentencing judge. The United States Supreme Court found in Leland, 343 U.S. at 801, that the “irresistible impulse” test of insanity was not implicit in the concept of ordered liberty. Additionally, the minimum requirements of any criminal offense are still a voluntary act and companion mental state. Section 45-2-202, MCA, provides that “[a] material element of every offense is a voluntary act . . . .”
This Court has not judicially recognized the automatism defense. Applications of the defense may exist where a defendant acts during convulsions, sleep, unconsciousness, hypnosis or seizures. See, People v. Grant (1978), 71 Ill.2d 551, 377 N.E.2d 4. Our criminal code’s provisions requiring a voluntary act and defining involuntary conduct adequately provide for such defenses. See Sections 45-2-202 and 45-2-101(31), MCA.
To the extent that the 1979 criminal code revisions allegedly eliminated the defense of insanity-induced volitional impairment, we find no abrogation of a constitutional right.
C. Eighth Amendment Considerations
Appellant next contends that abolition of the affirmative defense of insanity violates the Eighth Amendment’s prohibition of cruel and unusual punishment. In Robinson v. California (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, the Supreme Court held that punishment for the status crime of drug addiction violated the Eighth Amendment prohibition. The Court declared that any law which created a criminal offense of being mentally ill would also constitute cruel and unusual punishment. The Court noted that had the California statute under which Robinson was convicted required proof of the actual use of narcotics, it would have been valid. In Powell v. Texas, 392 U.S. at 532, a stat *333 ute imposing a fine for public intoxication was found to not violate the Eighth Amendment. There the Court reasoned that although alcoholism might be a disease, the statute was valid because it punished an act, not the status of being an alcoholic.
The Montana Criminal Code does not permit punishment of a mentally ill person who has not committed a criminal act. As such, the statutes avoid the constitutional infirmities discussed in Robinson v. California, supra, and Powell v. Texas, supra.
Prior to sentencing, the court is required to consider the convicted defendant’s mental condition at the time the offense was committed. This review is mandatory whenever a claim of mental disease or defect is raised. The plain language of the statute reads: “. . . the sentencing court shall consider any relevant evidence . . .” Section 46-14-311, MCA. (Emphasis added.) Whenever the sentencing court finds the defendant suffered from a mental disease or defect, as described in Section 46-14-311, MCA, the defendant must be placed in an “. . . appropriate institution for custody, care and treatment . . . .” Section 46-14-312(2), MCA.
These requirements place a heavy burden on the courts and the department of institutions. They serve to prevent imposition of cruel and unusual punishment upon the insane. Since the jury is properly preoccupied with proof of state of mind, it is imperative that the sentencing court discharge its responsibility to independently review the defendant’s mental condition.
It is further argued that subjecting the insane to the stigma of a criminal conviction violates fundamental principles of justice. We cannot agree. The legislature has made a conscious decision to hold individuals who act with a proven criminal state of mind accountable for their acts, regardless of motivation or mental condition. Arguably, this policy does not further criminal justice goals of deterrence and prevention in cases where an accused suffers from a *334 mental disease that renders him incapable of appreciating the criminality of his conduct. However, the policy does further goals of protection of society and education. One State Supreme Court Justice who wrestled with this dilemma observed: “In a very real sense, the confinement of the insane is the punishment of the innocent; the release of the insane is the punishment of society.” State v. Stacy (Tenn. 1980), 601 S.W. 2d 696, 704 (Henry J., dissenting).
Our legislature has acted to assure that the attendant stigma of a criminal conviction is mitigated by the sentencing judge’s personal consideration of the defendant’s mental condition and provision for commitment to an appropriate institution for treatment, as an alternative to a sentence of imprisonment.
For the foregoing reasons we hold that Montana’s abolition of the insanity defense neither deprives a defendant of his Fourteenth Amendment right to due process nor violates the Eighth Amendment proscription against cruel and unusual punishment. There is no independent constitutional right to plead insanity.
II. REBUTTAL TESTIMONY
The evening before the final day of trial, the Ravalli County Attorney’s office received word that Cedric Hames could testify he purchased ammunition for Korell a couple days before the shooting. Hames was told to report to the courthouse the next morning where a subpoena would await him.
Hames was the owner of a bar that the defendant frequented in the weeks preceding the shooting. The prosecution briefly interviewed Hames in the morning and decided to put him on the stand. Since Korell had twice requested Hames to buy ammunition for him in the days before the shooting, Hames’ testimony would tend to rebut defendant’s claim that he did not act purposely or knowingly.
Hames was put on the stand without any prior notice to the defendant or the court. Our discovery statutes specifi *335 cally provide that the defendant and the court must be given such notice:
“For the purpose of notice only and to prevent surprise, the prosecution shall furnish to the defendant and file with the clerk of the court no later than 5 days before trial or at such later time as the court may for good cause permit a list of witnesses the prosecution intends to call as rebuttal witnesses to the defenses of justifiable use of force, entrapment, compulsion, alibi, or the defense that the defendant did not have a particular state of mind that is an essential element of the offense charged.” Section 46-15-301(3), MCA.
Hame’s testimony was short and to the point. Defense counsel did not object to the direct examination of the witness. However, after counsel learned on cross-examination that the witness had contacted the prosecution the day before defense moved for a mistrial.
Outside the presence of the jury, the court heard arguments of counsel and interviewed the witness. Convinced that there was no designed surprise by the prosecution, the court denied the motion for a mistrial. Defense counsel was offered a continuance to prepare cross-examination. Defense refused this offer and chose not to examine the witness further.
Failure of the county attorney to give the court and defendant notice of the new rebuttal witness constituted clear error.
This issue concerning the failure of the prosecution to give notice of a rebuttal witness arose in State v. Madera (Mont. 1983), [206 Mont. 140,] 670 P.2d 552, 40 St.Rep. 1558. In Madera a witness not previously announced was used by the prosecution on the last day of trial to rebut an alibi witness. This Court announced that when unanticipated exigencies arise at trial the court may waive the time limitations for giving notice when good cause is shown. Additionally, this Court said that if surprise is claimed by the other party, the proper procedure is to ask for a contin *336 uance so that preparation may be made.
While Madera established that the time limitations of Section 46-15-301(3), MCA, may be waived, it did not suggest that notice may also be waived. There was no reason the deputy county attorney could not have notified the court and defendant that Hames had come forward the morning he testified. Had such notice been given, the court could have ruled whether there was good cause to waive the time limitations.
The recognized error in this case does not rise to the level of reversible error. Defense counsel was given an opportunity to prepare for cross-examination. The continuance offer was refused. Counsel claims prejudicial surprise on appeal yet did not avail himself of the opportunity to alleviate such prejudice at trial.
While the prejudicial surprise of this particular testimony is found harmless error, future prosecutorial disregard of these discovery notice provisions will not be condoned.
III. VOLUNTARY INSTRUCTION
The trial court refused an instruction offered by the defendant that: “A material element of every crime is a voluntary act.” The court did include four instructions that specifically mentioned the requirement of voluntariness:
“[Instruction No. 17] A person commits the offense of attempt when with purpose to commit a specific offense he voluntarily does any act toward the commission of such offense.”
“[Instruction No. 24] . . . the State must prove that each element of the offense was done purposely or knowingly and voluntarily . . . .”
“[Instruction No. 38] . . .You may consider such evidence because the defendant asserts that due to mental disease or defect he could not have had a particular state of mind which is an element of the offense, i.e., that he did not purposely or knowingly and voluntarily commit the acts constituting the offense ...”
*337 “[Instruction No. 40] ... a person to be guilty of any of the offenses charged, must have committed the act or acts voluntarily, while having, with regard to each element contained in the law defining the offenses, one of the mental states contained in said definition . . . .”
The refused instruction is based on Section 45-2-202, MCA, which states: “A material element of every offense is a voluntary act . . .” This code provision expresses the common law principle previously discussed that every crime must consist of an act and a criminal intent.
One of defendant’s theories in this case was that he did not act voluntarily due to his mental condition. Although this Court permitted Section 45-2-202, MCA, to be used for such a theory in Zampich, supra, the statute was not intended to address psychological impairment. The voluntary act requirement properly reflects physiological considerations; those who act by reflex, while sleepwalking, etc., should not be held criminally responsible. See, Section 45-2-101(31), MCA; Bender, supra, at 144-145; W. LaFave & A. Scott, Criminal Law Section 25, at 179-181 (1972).
Defendant’s theory of his case was not prejudiced by the trial court’s refusal to give the instruction. Arguably, the instruction would not have hurt the prosecution as it correctly states the law of Montana. However, we sense that defense counsel was offering the instruction for a context to which it was not designed. The four instructions set forth above properly instructed the jury on the requirement of a voluntary act.
IV. SENTENCING
Four doctors testified before the jury concerning Korell’s mental condition. The State produced Dr. Herman Walters, Ph.D., a clinical psychologist, and Dr. Verne Cressey, M.D., a psychiatrist. The defendant called Dr. William Stratford, M.D., a forensic psychiatrist, and Dr. Michael Marks, Ph.D., a clinical psychologist. Additionally, a psychiatrist, Dr. Noel Howell, M.D., was retained by the de *338 fense and filed an evaluation with the court although he did not testify.
These expert witnesses were allowed to express their opinions concerning Korell’s medical diagnosis, whether he suffered from mental disease or defect at the time of the shooting, his capacity to form the requisite intent and his ability to control his behavior. Additionally, Dr. Stratford was called to testify at the sentencing hearing on his recommendations for treatment of Korell. All the doctors filed written evaluations with the court.
Immediately after announcing sentence, the trial judge stated:
“I’m going to address myself in regard to your mental condition. Let me say that the jury heard the evidence by all of the various doctors in regard to your mental condition. The jury reached their conclusion after some twenty-four to twenty-six hours, and in that conclusion they found that you were responsible and that you did have the mental state required by the statute. For me to indulge otherwise would amount to nothing but nullification of the jury’s effort, and I will not do so.”
This pronouncement flies in the face of the court’s basic duty to independently evaluate the defendant’s mental condition. The trial judge’s refusal to act compels this Court to vacate the defendant’s sentence and remand for resentencing.
As Part I of this opinion established, whenever mental disease or defect is put in issue, the trial judge must review the defendant’s mental condition prior to sentencing. Deferring to a jury verdict indicates a misunderstanding of the distinct roles of the jury and court.
The jury has a narrow duty under the statutes: to consider mental disease or defect insofar as it relates to criminal state of mind. The fact that a jury has found the existence of a requisite mental state does not conclusively establish the defendant’s sanity or fitness for penal punishment. That determination must be independently made by *339 the sentencing judge and the record must reflect the deliberative process.
If problems of cruel and unusual punishment of the insane are to be avoided, the sentencing judge must faithfully discharge the review duties of Sections 46-14-311 and 46-14-312, MCA. The sentence is vacated.
V. ATTORNEY FEES
As a final matter, defense counsel appeals the order affixing his attorney fees. The court determined that reasonable fees for Korell’s defense were $12,000 and awarded the appointed attorney this amount. Counsel contends that the amount is unfair in light of the defense presented.
This Court has adopted guidelines to be followed when awarding a court-appointed attorney compensation. Those guidelines are set forth in State v. Boyken (1981), 196 Mont. 122, 637 P.2d 1193, and the District Court order at issue. That order reflects that the District Court properly considered the Boyken factors of time expended, nature of the defense, fees paid for similar services elsewhere, public funds available, the responsibility of the legal profession, and needs of the accused. Having so reached its decision, we will not disturb the trial court’s award of fees.
We remand this cause to the District Court for resentencing consistent with this opinion.
MR. JUSTICES WEBER, HARRISON and GULBRANDSON concur.