No. 91-289

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

JOE JUNIOR COWAN,

      Defendant and Appellant.

FILED

OCT 06 1993

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Ed McLean, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

      Margaret L. Borg and William **Boggs,** Missoula

      For Respondent:

      Hon. Marc Racicot, Attorney General: Barbara
Harris, Assistant Attorney General, Helena

      Robert L. Deschamps 111, County Attorney,
Missoula

Submitted: April **4,** 1993

Decided: October 6, 1993

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

The District Court for the Fourth Judicial District, Missoula County, sitting as the trier of fact, convicted Joe Junior Cowan of aggravated burglary and attempted deliberate homicide. He appeals. We affirm.

The issues are:

1. Did the State prove the mental element of the crimes of attempted deliberate homicide and aggravated burglary beyond a reasonable doubt?

2. Do the Montana statutes governing the presentation of evidence of mental disease or defect in effect establish a conclusive or unrebuttable presumption of criminal intent in contravention of the doctrine enunciated in Sandstrom v. Montana?

3. Does sentencing and confining Cowan to prison violate the Eighth and Fourteenth Amendments to the United States Constitution because of his mental condition?

On April 23 or 24, 1990, Joe Junior Cowan broke into a United States Forest Service cabin at the Lolo Work Center, eighteen miles west of Lolo, Montana. When the occupant of the cabin came home on the evening of the 24th, it was clear to her that someone had been in her cabin eating her food, watching her television, and generally making himself at home. She called "911" and locked her doors before Cowan again broke in and assaulted her with a tree-planting tool called a hodag.

2

Sheriff's deputies responding to the victim's phone call apprehended Cowan at the Work Center. He had in his possession a backpack containing some of the victim's belongings. He did not resist arrest. The victim was found semi-conscious on the floor of her kitchen. She survived, despite injuries including a punctured lung, broken ribs, a broken scapula, a dislocated shoulder, and a skull fracture.

Cowan has been diagnosed as suffering from paranoid schizophrenia, a serious mental disorder. Prior to trial, he was evaluated by psychiatrists and found competent to stand trial.

Cowan waived his right to a jury trial. At his bench trial, he argued that he did not act deliberately in committing these offenses. He asserts that he was in an acute psychotic episode at the time of the attack and that he was under the delusion that the victim was a robot, not a human being. Mental health professionals testified for both Cowan and the State on this issue. The court found Cowan guilty as charged.

At Cowan's sentencing hearing, the court heard argument about whether he should be confined in a prison or a mental institution. The court ordered him committed to the custody of the Montana Department of Institutions "for placement in a facility deemed appropriate to [his] need for treatment and society's need for protection from [him]."

I

Did the State prove the mental element of the crimes of attempted deliberate homicide and aggravated burglary beyond a reasonable doubt?

Our standard of review is whether, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found Cowan guilty beyond a reasonable doubt of the crimes with which he was charged. State v. Bower (1992), 254 Mont. 1, 6, 833 P.2d 1106, 1110. The charge of attempted deliberate homicide required proof that Cowan purposely or knowingly attempted to cause the death of another human being. Sections 45-4-103 and 45-5-102, MCA. The aggravated burglary charge required proof that he knowingly entered or remained in an occupied structure with the purpose to commit an offense and was armed with a weapon. Section 45-6-204(2)(a), MCA. Cowan concedes the conduct elements of both offenses. He challenges the finding that he acted knowingly or purposely.

"Knowingly" and "purposely" are defined at § 45-2-101(33) and (58), MCA:

> (33) "Knowingly"--a person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware of his conduct or that the circumstance exists. A person acts knowingly with respect to the result of conduct described by a statute defining an offense when he is aware that it is highly probable that such result will be caused by his conduct. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of

4

its existence.  Equivalent terms such as "knowing" or "with knowledge" have the same meaning.

. . .

(58) "Purposely"--a person acts purposely with respect to a result or to conduct described by a statute defining an offense if it is his conscious object to engage in that conduct or to cause that result.  When a particular purpose is an element of an offense, the element is established although such purpose is conditional, unless the condition negatives the harm or evil sought to be prevented by the law defining the offense.  Equivalent terms such as "purpose" and "with the purpose" have the same meaning.

Cowan contends the most conservative conclusion one could draw from the expert testimony in this case is that it clearly raised a reasonable doubt about whether he acted deliberately in committing the offenses.  He cites the evidence that he had suffered for years from a serious mental disorder, paranoid schizophrenia.  A psychologist testified on behalf of Cowan that there was "reasonable scientific evidence" that he was suffering an acute psychotic episode at the time of the incident.  The psychologist who appeared on behalf of the State testified that "the presence of his disorder . . . plus that kind of behavior certainly raised the possibility of psychosis at that time."

However, the expert testimony concerning whether Cowan was in a psychotic episode at the time of the attack was less than unequivocal.  Exaggeration of symptoms was a concern.  It was not until his third interview with the State's psychologist that Cowan stated he was under a delusion that the victim was a robot at the

time of the attack. Before that, he described her as a "large white woman" who looked stronger than he was.

The experts testified that Cowan's paranoid schizophrenia is episodic and that it waxes and wanes. They testified that they could not determine with certainty whether Cowan was in the midst of a psychotic episode at the time of the attack. Also, the State's expert testified that Cowan's intelligence, motive, and past experiences were sufficient to enable him to falsify symptoms of psychosis. One of Cowan's experts testified that Cowan had a history of "going into places that belonged to other people and just basically hanging around for a while and eating."

The expert witnesses also testified that Cowan had a history of assaults on females and had been through the criminal process before. The psychologist who testified for Cowan admitted that, according to the diagnostic manual he used, malingering should be strongly suspected in certain circumstances, including if the patient is referred in a legal context or if the person has antisocial personality disorders. He also testified that, in answer to a question in a psychological test, Cowan stated that he frequently lies to get out of trouble.

The weight of evidence and the credibility of witnesses are within the province of the trier of fact. State v. Whitcher (1991), 248 Mont. 183, 188, 810 P.2d 751, 754. A factfinder may find credible some, all, or none of the testimony of any witness. State v. LeDuc (1931), 89 Mont. 545, 562, 300 P. 919, 926. As the

*6*

trier of fact in this case, the court could have, for example, found credible the evidence that Cowan suffers from paranoid schizophrenia but disbelieved that Cowan was in a psychotic state which prevented him from acting knowingly or purposely on April 24, 1990.

Moreover, the issue before the court in the trial phase of this action was not whether Cowan was in a psychotic state, but, as stated above, whether he acted purposely or knowingly. The existence of a mental disease or defect in a person does not necessarily preclude the person from acting purposely or knowingly. State v. Byers (Mont. 1993), ___ P.2d ___, ___, ___ St.Rep. ___, ___, citing State v. Korell (1984), 213 Mont. 316, 690 P.2d 992. The State's expert felt that, on April 24, 1990, Cowan was able to act with purpose or knowledge. Cowan's expert psychiatrist agreed that eyewitness testimony is as important in determining what a person was feeling or thinking at a particular time as is the testimony of experts. He did not obtain information from eyewitnesses before rendering his opinion, however.

Cowan states that the eyewitness testimony of the victim and the officers who arrested him describes bizarre, senseless, reckless, and terrifying behavior. He refers to his actions of trying to tear the license plates off the victim's car prior to attacking her, approaching the victim even when he could see she had a shotgun pointed at him, and, when the authorities arrived, running from them only to retrieve his backpack.

7

A deputy county sheriff who talked to Cowan and offered him a ride on the day before the attack, near the Work Center, stated that Cowan was coherent and able to carry on a normal conversation then. Cowan told the officer he planned on camping in the area. At the time of the attack, Cowan was lucid enough to be able to eavesdrop on the victim's telephone call to "911" from an extension phone in another building. He was rational enough to slash the tires on the victim's car and to use a tool to break through the locked front door of her cabin after finding all the doors to the cabin locked. The victim described Cowan circling her cabin before he broke in, mocking her pleas to leave and to let her go. She described his facial expression as "mad, angry, serious." He called her a "society bitch," in addition to calling her, as the defense points out, a "robot bitch." After he entered the cabin, and in the midst of assaulting her with the hodag, he wrestled the shotgun away from her and attempted to shoot her with it.

The District Court found that, prior to his attack on the victim, Cowan had made no statements or comments to mental health care givers indicating a delusional belief system involving the existence of robots disguised as humans. There is no evidence to the contrary in the trial transcript. The court further found that, in discussing the attack with mental health professionals, Cowan has referred to the victim as "she," "her," and a "white woman." That finding is supported in the record. The court then

found that, during the attack, Cowan "was conscious of the fact that [the victim] was a human woman."

After reviewing the record, and viewing it in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Cowan possessed the requisite mental state to be convicted of the crimes with which he was charged.

II

Do the Montana statutes governing the presentation of evidence of mental disease or defect in effect establish a conclusive or unrebuttable presumption of criminal intent in contravention of the doctrine enunciated in Sandstrom v. Montana?

In Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, the United States Supreme Court established that the Due Process Clause prohibits the use of a presumption which relieves the prosecution of the burden of proving mental state by requiring an inference of the existence of criminal intent from the fact of criminal conduct. In that case, the impermissible presumption was embodied in a jury instruction which recited statutory language providing that "a person intends the ordinary consequences of his voluntary acts."

Because this case was tried to the court, there were no jury instructions. Cowan bases his argument on statutes upon which he believes the court must have relied.

9

Evidence of a mental disease or defect is admissible in Montana under § 46-14-102, MCA, to prove that a criminal defendant did or did not have a state of mind that is an element of a charged offense. Cowan argues that because mental disease or defect does not, however, constitute a valid defense to a criminal charge in Montana, a conclusive presumption is established as to mental state in violation of the Due Process Clause as discussed in Sandstrom.

Cowan also argues that the court must have applied § 45-5-112, MCA. That statute provides that "{i}n a deliberate homicide, knowledge or purpose may be inferred from the fact that the accused committed a homicide and no circumstances of mitigation, excuse, or justification appear." Cowan argues that if any evidence of organized or integrated conduct will suffice to establish criminal intent beyond a reasonable doubt, in spite of clear manifestations of insanity, then no one who commits a criminal act can ever be acquitted on grounds of insanity because it would be impossible for anyone to cause harm without engaging in a minimal level of organized conduct.

We have previously affirmed the constitutionality of the abolition of the insanity defense in terms of violation of the right to due process. Byers, ___ P.2d at ____; Korell, 690 P.2d at 1002. As we noted in Byers and Korell, the United States Supreme Court has determined that the Due Process Clause does not require the use of any particular insanity test or allocation of burden of

10

proof.  Leland v. Oregon **(1952), 343** U.S.  **790, 72** S.Ct. **1002, 96** L.Ed. **1302,** reh. denied, **344** U.S.  **848.**

Section **45-5-112, MCA,** provides that any evidence of organized or integrated conduct <u>may</u> suffice to establish criminal intent in a deliberate homicide beyond a reasonable doubt.  The ultimate determination is left to the finder of fact.  Section **45-5-112,** MCA, establishes a permissive inference, not a conclusive presumption.  A statute establishing a permissive inference does not violate the rule stated in <u>Sandstrom</u>.  See State v. Woods **(1983), 203** Mont. **401, 415, 662** P.2d **579, 586;** State v. Coleman **(1979), 185** Mont. **299, 397-98, 605** P.2d **1000, 1052-53,** cert. denied, **446** U.S. **970,** reh. denied, **448** U.S. **914.**

We hold that the Montana statutes governing the presentation of evidence of mental disease or defect do not establish a conclusive or unrebuttable presumption of criminal intent in contravention of the doctrine enunciated in <u>Sandstrom</u>.

III

Does sentencing and confining Cowan to prison violate the Eighth and Fourteenth Amendments to the United States Constitution because of his mental condition?

Cowan states that it is inhumane to consider the insanity of a person accused of a crime only to reduce the degree of the crime or the punishment therefor.  He argues that sentencing an insane person like himself to the law-of-the-jungle conditions in prison is essentially a death sentence.  He cites People v. Skinner (Cal.

11

1985), 704 P.2d 752. In that case, the California Supreme Court stated that the M'Naghten test of insanity, which has been used since 1850, reflects a fundamental principle of criminal law. Skinner, 704 P.2d at 759.

We decline to adopt the reasoning of the California Supreme Court in Skinner. As we stated above, the United States Supreme Court has not required the use of any specific insanity test for purposes of due process. Montana's law allows consideration of a defendant's mental disease or defect at three stages--determination of fitness to stand trial, at trial to disprove state of mind, and at sentencing. Korell, 690 P.2d at 996-97. This Court has further explained:

> The [Montana] legislature has made a conscious decision to hold individuals who act with a proven criminal state of mind accountable for their acts, regardless of motivation or mental condition. Arguably, this policy does not further criminal justice goals of deterrence and prevention in cases where an accused suffers from a mental disease that renders him incapable of appreciating the criminality of his conduct. However, the policy does further goals of protection of society and education. . . .
>
> Our legislature has acted to assure that the attendant stigma of a criminal conviction is mitigated by the sentencing judge's personal consideration of the defendant's mental condition and provision for commitment to an appropriate institution for treatment, as an alternative to a sentence of imprisonment.

Korell, 690 P.2d at 1002.

We reiterate 'that Cowan was not sentenced to prison, but was placed in the custody of the Department of Institutions. The court specifically stated its purpose to provide for treatment of Cowan's

mental illness at a different facility if the Director of the Department of Institutions determines treatment at a different facility is needed.

We hold that the sentence imposed by the District Court does not violate the Eighth and Fourteenth Amendments to the United States Constitution.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____

_____
Justices

13

Justice Terry N. Trieweiler dissenting.

I dissent from the majority opinion.

I conclude that Montana's abolition of the insanity defense in 1979 violated the defendant's right to due process of law guaranteed under the Fourteenth Amendment to the United States Constitution, and Article 11, Section 17, of the Montana Constitution.

Based on the Legislature's abolition of the insanity defense in 1979, and this Court's approval of that change, a person in Montana can be convicted of serious crimes and sentenced to confinement in the State Prison (in this case for a period of up to 60 years), even though at the time of the acts with which they are charged they were unable to appreciate the criminality of their conduct or were unable to conform their conduct to the requirements of the law because of mental illness. This result flies in the face of those notions of fundamental fairness which have been universally accepted by civilized societies subscribing to English notions of justice for the past 700 years.

Furthermore, I disagree with the majority's reliance on the United States Supreme Court's decision in *Leland* v. ***State of Oregon*** (1952), 343 U.S. 790, 72 S. Ct. 1002, 96 L. Ed. 1302. While that Court did hold in that case that the defendant was not constitutionally entitled to a specific form of the insanity defense, it is implicit from that decision that some form of insanity defense is required by the due process clause. In fact,

14

subsequent to this Court's decision in *State v. Korell* (1984), 213 Mont. 316, 690 P.2d 992, the California Supreme Court cited *Leland* for exactly the opposite purpose for which it is cited by this Court. In *People v. Skinner* (Cal. 1985), 704 P.2d 752, the California Supreme Court, while discussing the due process dimensions of the insanity defense, stated that:

> Because mens rea or wrongful intent is a fundamental aspect of criminal law, the suggestion that a defendant whose mental illness results in inability to appreciate that his act is wrongful could be punished by death or imprisonment raises serious questions of constitutional dimension under both the due process and cruel and unusual punishment provisions of the Constitution. In *Leland v. Oregon* (1952), 343 **U.S.** 790, 72 S.Ct. 1002, 96 L.Ed. 1302, the court upheld an Oregon law placing the burden of proving insanity beyond a reasonable doubt on the defendant and affirmed the right of the state to formulate the applicable test of legal insanity. In so doing, however, the court measured the law under due process standards, concluding that the irresistible impulse extension of traditional insanity test was not "'implicit in the concept of ordered liberty.'" (343 U.S. at **p.** 801, 72 S.Ct. at 1009). The court thus seemingly accepted the proposition that the insanity defense, in some formulation, *is* required by due process. (See also *Robinson v. California* (1962), 370 *U.S.* 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758, suggesting that punishment for the status of being mentally ill would constitute cruel and unusual punishment.) Scholars, too, suggest that abolition of the traditional insanity defense may be constitutionally impermissible if the result would be imposition of punishment on a mentally ill person for acts done without criminal intent. (See Robitscher & Haynes, *In Defense of the Insanity Defense* (1982) 31 Emory L.J. 9; Note, *The Proposed Federal Insanity Defense: Should the Quality of Mercy Suffer for the Sake of Safety* (1984) 22 **Am.** Crim.L.Rev. 49.)

> This court suggested a similar view in *People v. Coleman* (1942), 20 Cal.2d 399, 407, 126 P.2d 349, where we observed: "Obviously an insane person accused of crime

15

would be inhumanely dealt with if his insanity were considered merely to reduce the degree of his crime or the punishment therefor."

*Skinner,* **704** P.2d at 757-58.

Montana's statutory scheme for dealing with mental illness does exactly what the California Supreme Court suggests would violate due process and cruel and unusual punishment provisions of the Constitution. It allows for conviction and punishment of those who are unable to appreciate the criminality of their conduct, and substitutes for the insanity defense the mere option of the district court to take mental illness into consideration when deciding the degree of punishment or nature of confinement.

While evidence of mental disease or defect is admissible to prove that a defendant did not have a state of mind that is an element of the offense, it is clear that Montana's law does not take into consideration the defendant's ability to appreciate the criminality of his conduct or conform his conduct to the law. The only state of mind that had to be proven to convict the defendant in this case was that he acted knowingly and purposely at the time of the illegal conduct with which he is charged. Based on Montana's definitions of knowingly and purposely, he could act with both states of mind and still not appreciate the criminality of his conduct nor be able to conform his conduct to the law. The facts of this case are a perfect example.

The behavior of defendant, as described by the victim of his brutal conduct, was nothing less than bizarre and irrational.

**16**

While he circled her house looking for a point of entry, he referred to her as a "robot bitch." He kicked at her car and inexplicably pulled at her license plate. He flattened all four tires of her vehicle, but made no effort to remove the keys from the ignition. When the victim demanded that defendant leave the premises, he would grunt and mimic her. However, most of what he said was unintelligible. When he did finally gain entry to the house, she pointed a gun at him and pulled the trigger. However, he was undeterred by the threat from her gun. When the victim asked defendant who he was and what he wanted, he would simply mimic her by repeating what she said. She also recalled that he told her she was in his house and that she should get out of his house.

After defendant's assault on his victim and the arrival of at least two Missoula County Deputy Sheriffs, defendant was observed by one of those deputies in front of the mess hall near the building where the assault occurred. That deputy, who was armed, told him to stop. However, again disregarding the threat to his safety, he ran around to the back of the building where he retrieved his backpack. The deputy followed him to the back of the building where she found him standing with his backpack. After that point in time, he obeyed all of the deputy's instructions.

Defendant was examined by numerous psychologists and psychiatrists prior to trial. One psychiatrist and two clinical psychologists gave testimony at trial. Everyone who examined

defendant concluded that he was suffering from paranoid schizophrenia, a form of mental disease, which even the State's psychologist conceded may have precluded defendant from understanding and appreciating the criminality of his conduct at the time of the crime with which he was charged.

Dr. Noel Hoell testified that he was a psychiatrist practicing in Missoula who interviewed defendant, reviewed his previous medical records from North Carolina, and did a mental status evaluation. From his investigation, he learned that defendant had been hospitalized on a number of previous occasions with diagnoses of depression, having psychotic features, and schizophrenic disorder. He concluded from his own examination that defendant suffered from serious mental illness which he diagnosed as schizophrenia. He testified that common symptoms of schizophrenia are hallucinations, delusions, and paranoid ideas. He said that it is a psychotic disorder which implies a break in one's ability to understand and deal with reality. His diagnosis was illustrated by his conversations with defendant during which he stated that defendant displayed delusional thinking and talked about people being programmed by religious groups and the government to control their behavior.

Dr. Hoell reviewed the records from defendant's evaluation at the Montana State Hospital and found nothing inconsistent in the State's evaluation.

Dr. Hoell learned from his interview with defendant that defendant thought he was on his own property at the time of his assault on the victim, and also believed that the victim was not really a human being, but believed she was a mechanical robot. He testified that defendant felt endangered by the victim when she began yelling and screaming in a menacing sort of way.

Most importantly, Dr. Hoell testified that, in his opinion, defendant was in a psychotic state at the time that he attacked his victim. In that state, he could not understand or deal with reality because of hallucinations, delusions, and misinterpretation of events. He could satisfy Montana's requisite mental state because he could make a decision about what he was doing within his own sense of reality. In other words, he could act with purpose and knowledge. However, Dr. Hoell testified that because of defendant's mental defect, he did not appreciate the nature of his attack on the victim and was not able to appreciate the criminality of his conduct. In fact, it was Dr. Hoell's opinion that defendant did not even appreciate that the death of a human being was a potential result of his conduct.

Robert A. Shea was a clinical psychologist in Missoula who examined defendant at the request of the public defender's office. He reviewed the history of defendant's mental disease, and found that it was progressive. He reviewed the records of Dr. Will Stratford, Herman Walters, Ph.D., and the psychiatrist who examined

defendant at the State Mental Hospital, and stated that they had all, likewise, diagnosed paranoid schizophrenia.

Dr. Shea interviewed the victim of defendant's attack and custodial people at the Missoula County Jail to learn about defendant's behavior. They described it as crazy and weird. On occasion, he was observed hiding underneath his bunk with the mattress wrapped around himself.

From April 25, when Dr. Shea first examined defendant, until September **2,** he saw defendant's behavior deteriorate to a point where he became concerned about defendant's ability to aid in his **own** defense. When he finally was able to get defendant to talk about the incident with which he was charged, defendant told him he had been defending himself against a robot. There was nothing in the conversations to suggest to Shea that defendant thought he was dealing with a human being.

According to Shea, defendant even had some concerns that his own attorney might be a robot.

Shea's diagnosis was also paranoid schizophrenia.

He testified that while acting in a psychotic schizophrenic state, defendant could act with purpose and could act knowingly, as those terms are defined in Montana's criminal code. However, at the same time, defendant would not be able to understand the real implications of his conduct because of the delusions under which he would have acted. It was Shea's opinion that on the night of the conduct which formed the basis of criminal charges against

defendant, he was suffering from a mental disease or defect which prevented him from understanding the nature of the act he was committing and appreciating the criminality of his conduct, even though he was capable of acting purposely and knowingly while he thought he was defending himself against a robot.

Dr. Herman Walters, a clinical psychologist from the University of Montana, was retained by the State to consult with Dr. Will Stratford for purposes of evaluating defendant.  He and Stratford, likewise, diagnosed defendant with paranoid schizophrenia.  Although he stated it would be difficult to state what a person's mental condition was at some point in the past, he stated that defendant's thoughts were disordered and that he was acting in a delusional fashion during his third interview with him. He testified that it was possible that defendant was delusional or psychotic at the time of the incident, but he could not say for sure.  He did explain that if defendant had been delusional, his conduct would have been based on false assumptions and false premises.  Most importantly, Dr. Walters testified that in a delusional state, defendant could act purposely and knowingly and still not be able to appreciate the criminality of his conduct.

There was no testimony from any witness to controvert the expert medical opinion that, because of serious mental disease, defendant was unable to appreciate the criminality of his conduct at the time that he assaulted his victim.

**21**

The result in this case is the worst case scenario anticipated by national critics of Montana's insanity laws and brought to this Court's attention in Justice Sheehy's dissent to our decision in *Korell*. There, he brought the following illustration to our attention:

> "Yet the issue of criminal blameworthiness should require a deeper inquiry. Implicit in this concept is a certain *quality* of knowledge and intent, going beyond a minimal awareness and purposefulness. Otherwise, for example, a defendant who knowingly and intentionally kills his son under the psychotic delusion that he is the biblical Abraham and his son, the biblical Isaac, could be held criminally responsible. The Montana, Idaho and Utah enactments, on their face, would deny a defense to such a defendant." American Bar Association, Standing Committee on Association Standards for Criminal Justice, Report to the House of Delegates, August, 1984, Standard 7-6.1, Commentary P.327.
>
> Thus has Montana's abolition of the insanity defense in 1979 been held up for criticism and disrespect by national authorities and scholars.

*Korell*, 690 P.2d at 1009.

The majority's conclusion that abolition of the insanity defense does not violate the due process clauses of the Montana or Federal Constitutions is based largely on its prior decision in *Korell*, and that decision's interpretation of *Leland.*

The inadequacy of this Court's decision in *Korell*, and the inaccuracy of its analysis of *Leland* is thoroughly set forth by the dissenting opinion of Justice McDevitt in *State v. Searcy* (Idaho 1990), 798 P.2d 914. I agree with that analysis, and would follow it in this case.

22

As pointed out in the *Searcy* opinion, there are no U.S. Supreme Court decisions which directly address the issue of whether the insanity defense can constitutionally be abolished. The reason is that there are only three states which do not currently permit an insanity defense. However, as noted by the majority in *Korell:*

> Three older state court decisions have found state statutes abolishing the insanity defense to be unconstitutional. *State* v. *Lang* (1929), 168 La. 958, 123 So. 639; *Sinclair v. state* (1931), 161 Miss. 142, 132 So. 581; *State v. Strasburg* (1910), 60 Wash. 106, 110 P. 1020.

*Korell,* 690 P.2d at 999. The majority distinguishes these decisions because the statutory schemes under attack in those cases did not permit introduction of mental disease for the limited purposes for which such evidence is allowed under our statutory scheme. However, I find that distinction unpersuasive.

The only reported decision outside of Montana which I am familiar with and which specifically upholds abolition of the insanity defense is the majority opinion in *Searcy.* In his well-documented opinion dissenting from that decision, Justice McDevitt made several important points.

First, he examined the various tests for due process that have been set forth over the years. He observed that:

> In *Palko v. Connecticut,* 302 U.S. 319, 324-25, 58 S.Ct. 149, 151-52, 82 L.Ed. 288 (1937), Justice Cardozo wrote that those particulars of the Bill of Rights which must be held to apply as against the States through the Fourteenth Amendment Due Process Clause are those which "have been found to be implicit in the concept of ordered liberty, . . ." such that "a fair and enlightened system of justice would be impossible without them,"

*Searcy*, 798 P.2d at 927.

He noted that:

> The underlying theme of these various formulations of "due process" is a sense of historical precedent upon which American institutions were founded and our continuing legal traditions. Thus, the proper focus in evaluating the place of a particular doctrine in the concept of due process is the pervasiveness of the doctrine in the history of the common law. A review of the extensive history of the insanity defense in the law of England and the United States leads to the conclusion that due process does require the availability of that defense to criminal defendants.

*Searcy*, 798 P.2d at 928.

As noted in Justice McDevitt's dissent, the insanity defense has existed as an excuse to crime from the time of the reign of Edward I during the 13th Century, and was well established by the 16th Century. *Searcy*, 798 P.2d at 928-29. He pointed out that as early as the 18th Century there was recorded case law to the effect that a man deprived of reason cannot be guilty. The jury was so instructed in *Rex v. Arnold*, 16 How.St.Tr. 695 (1724). American cases closely tracked English law from the time that insanity was first considered as a defense in this Country's courts. *In re Clark*, 1 City Hall Recorder (N.Y.) 176 (1816), and *In re Ball*, 2 City Hall Recorder (N.Y.) 85 (1817).

Then, in 1843, *M'Naughten's Case*, 8 Eng.Rep. 718 (H.L. 1843), was decided. That case provided that a person suffering from disease of the mind, to the extent that they did not know the nature and quality of their conduct, or did not know that what they were doing

24

was wrong, could not be guilty of a crime. The *M'Naughten* rule, in some form or another, has been followed in virtually every American jurisdiction until 1979. However, whether following the *M'Naughten* rule, or some other variation of the insanity defense, McDevitt points out that the appropriateness of the defense has rarely been questioned.

Second, McDevitt pointed out that there were three legislative attempts to abolish the insanity defense between 1910 and 1931, but that each of those legislative enactments were overturned by the state supreme courts where they were attempted. *Searcy*, 798 P.2d at 932. Referring to this Court's discussion of those decisions in *Korell*, Justice McDevitt pointed out that:

> The Montana Supreme Court, in its recent decision upholding the 1979 abolition of the defense in Montana, effortlessly distinguished those three cases because "[t]hey interpret statutes that precluded *any* trial testimony of mental condition, including that which would cast doubt on the defendant's state of mind at the time he committed the charged offense." *Korell*, 213 Mont. at 329, 690 P.2d at 999 (emphasis in original). The *Korell* court felt that Montana's allowance for psychiatric evidence going to the issue of *mens rea* at trial removed any precedential value from those three prior cases. However, I believe that two of those cases have greater applicability to the issues faced in *Korell* and by this Court than the Montana Supreme Court would allow.

*Searcy*, 798 P.2d at 932.

For the reasons mentioned by the dissent in *Searcy*, I agree.

Finally, the dissenting opinion in *Searcy* points out that:

25

Another, albeit less authoritative, test of whether a particular doctrine is **"implicit** in the concept of ordered liberty" other than the history of the legal concept, is the unanimity with which the doctrine is adopted among American jurisdictions. With the exception of the three attempted legislative abolitions of the insanity defense noted above, and the recent rejections of the defense in Montana (1979), Idaho (1982), and Utah (1983), the insanity defense has been universally accepted in all American jurisdictions throughout this nation's history.

*Searcy,* 798 P.2d at 934.

Based upon the foregoing, and based on the inapplicability of those authorities relied upon by the majority of the Idaho Supreme Court and the majority of this Court, the dissent in *Searcy* concluded that:

I believe it is evident that the defense has an independent existence of sufficient duration and significance to entitle it to a place in our American concept of "ordered liberty."

*Searcy,* 798 P.2d at 927.

I agree.

I believe as strongly as anyone that innocen people mus be protected from those who are a danger to society, whether their behavior results from mental disease or simply an antisocial personality. However, the alternative to imprisoning those whose behavior results from insanity, over which they have no control, is not to turn them loose on society. Our law prior to 1979 provided that when a defendant is acquitted based on the defense of mental disease or defect, he or she must be committed to the custody of the superintendent of the Montana State Hospital for so long as

26

they remain a threat to society. Section 95-508, R.C.M. (1947). That procedural safeguard has been carried forward to our current statutory scheme. Section 46-14-301, MCA.

However, at a time of serious prison overcrowding, the unavailability of public funds with which to build new prisons, and obvious administrative problems controlling current prison populations, the last thing in the world that makes sense is to use prisons as warehouses for the insane. That obvious conclusion, by itself, is a matter of public policy which should normally be of no concern to the judiciary. But, when using prisons to house the insane results from a denial of the due process which is guaranteed under our State and Federal Constitutions, it should be of concern to the judiciary. I conclude that the abolition of the insanity defense in Montana is, for the reasons previously mentioned, a violation of due process. Joe Junior Cowan is certifiably insane and it was uncontroverted that at the time of the acts with which he was charged, he did not understand that his conduct was wrong or illegal. While the interests and safety of society may require that he be institutionalized for the rest of his life, or the duration of his mental illness, centuries-old standards of decency prohibit his conviction and placement in the Montana State Prison for an act which he could not appreciate was illegal. Therefore, I would reverse the judgment of the District Court.

Justice

27

Justice William E. Hunt, Sr., joins in the foregoing dissent.

_____
Justice

October 6, 1993

CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


Margaret L. Borg
Missoula Public Defender's Office
317 Woody St.
Missoula, MT  59802

William Boggs
Attorney at Law
P.O. Box 7881
Missoula, MT   59807

Hon. Marc Racicot, Attorney Gereral
Barbara Harris, Asst. Atty. Gen.
Justice Building
Helena, Mt  59620

Robert L. Deschamps, III,
Missoula County Attorney
County Courthouse
Missoula, MT  59802


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA ,

BY:_____
      Deputy